[No. A059099. First Dist., Div. One. Jan. 20, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL GREEN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication with the exception of parts I through VI and parts VII(C) through X of the discussion.

## COUNSEL

Michael Satris, under the appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DOSSEE, J.**—Defendant was convicted of numerous crimes arising out of a gang-related drive-by shooting, including two counts of first degree murder.[1] The jury found the special circumstance allegation of multiple murders to be true, and defendant was sentenced to two terms of life imprisonment without the possibility of parole. He now appeals.

### FACTS

Defendant was a member of a youth gang centered in the Sunnydale neighborhood in San Francisco. The gang was in rivalry with gangs in the Hunter's Point neighborhood, chiefly for control of the crack cocaine trade.

In 1988-1989 minor turf battles between the gangs were common, usually consisting of verbal sparring or fist fights. On March 13, 1989, however, the violence escalated. Sunnydale gang members attacked a Hunter's Point gang member and his mother. The attack on the mother inflamed the sensibilities of the Hunter's Point gang members, and they soon retaliated. That same night Peter Lee, a popular Sunnydale gang member, was shot to death. Peter Lee had been defendant's "partner" in the Sunnydale gang.

---

[1]Defendant was also convicted of conspiracy to commit murder, attempted premeditated murder, shooting at an occupied vehicle, and 13 counts of assault with a firearm.

The person believed by Sunnydale gang members to be most responsible for the killing was Ronnie Lane, a Hunter's Point gang member.

Tension between the gangs was high and the police were aware that Sunnydale intended to settle the score. At Peter Lee's funeral, held ironically in Hunter's Point, Sunnydale mourners were taunted by Hunter's Point onlookers. Defendant was heard to vow revenge and scream death threats at the Hunter's Point spectators. The revenge was carried out in the early morning of April 8, 1989. Defendant and his cohorts drove into the Hunter's Point neighborhood and sprayed a populated intersection with bullets. Two people were killed and eleven others were injured.

On the night of April 7 there had been a large party in a park in Hunter's Point, and by the early morning of April 8 most of the party-goers were heading home. Clifford Polk was a resident of Hunter's Point and had attended the party. He also had friends in the Sunnydale gang. Polk called one of them, Caramad Conley, and told him he thought the Hunter's Point guard was down. Conley passed this information to other Sunnydale gang members, defendant among them, who decided to drive to Hunter's Point.

Two cars set out toward Hunter's Point from Sunnydale—one driven by John Johnson, the other by Juan Jones. Defendant was in the second car. The cars approached a crowd gathered on Newcomb Street, where Ronnie Lane had parked his car in the middle of the street. Lane and a group of people stood around the car, talking. Another car filled with women was also stopped in the street, and a group of young men had congregated around the car to chat.

Suddenly, witnesses heard shouts from within the approaching cars, and the shooting began.

D'Juana Starks and Gina Hinton, who had been standing outside Ronnie Lane's parked car, were both hit: Ms. Starks in the arm; Ms. Hinton in the arm and leg. Mary Jane Todd, who had been in the second parked car, was shot in the leg and elbow. Roshawn Johnson, another young woman in the car, was shot in the head and killed. Trina Garrett and Shona James, also in the car, were also shot. Spirit Banks and Rita James dove for the floor and were not hurt. Charles Hughes, who had been standing outside the women's car, tried to dive inside the car when the shooting started, but he was hit eight times and died. Four men standing nearby were also hit: Anderson Williams, in the wrist; Dominic Dupree, in the hip, Vernon Le Blanc, in the leg, and Anthony Lane, in the arm.

When the shooting started Ronnie Lane ducked behind a car where Antoine Goff also huddled. Defendant and another man then got out of one

of the two Sunnydale cars and ran after Ronnie Lane, firing at him with an automatic weapon. Julio Zayas, who had been standing nearby, also began to run, but he was hit in the leg and fell. Ronnie Lane escaped without injury but returned to the scene to take Zayas to the hospital.

Police recovered 40 to 45 shell casings and bullet fragments from the scene, most of them 9-millimeter. Criminalists testified that the expended ammunition found at the scene indicated the weapons used in the attack consisted of two Mac-10 or Mac-11 automatic weapons firing 9-millimeter ammunition, a shotgun, a .38-caliber or .357-caliber revolver and a .44 magnum revolver. There was testimony that defendant owned a Mac-10 assault weapon. The police also recovered nine shell casings from the car driven that night by John Johnson. Some of the casings matched those at the murder scene.

Afterward, graffiti appeared in Sunnydale claiming credit for the attack.

### DISCUSSION ·

### I.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### VII. *Juror Qualifications*

Defendant challenges various rulings by the trial court concerning the eligibility of certain jurors to serve on the jury.

### A. *Cheryl Jones*

#### 1. *Authority to Remove*

After the jury had deliberated more than two full days, the jury announced it had reached a verdict and returned to the courtroom. The clerk read the verdict forms indicating guilty on all counts. The jury was then polled, and in response to the court's question "Are these your verdicts . . . ?," juror No. five, Cheryl Jones, responded, "I don't know. I really don't." The trial court immediately sent the jury back into the jury room for further deliberations.

Eventually, as will be discussed in section 2 below, the trial court removed Ms. Jones and replaced her with an alternate juror, instructing the

---

*See footnote, *ante,* page 1001.

jury to disregard the previous verdict forms and to begin their deliberations anew. ▉ Defendant argues that the trial court lacked authority to remove the juror as the verdict had already been rendered. (He made the same argument in his motion for new trial.)

Penal Code section 1089 and Code of Civil Procedure section 234 permit the trial court to discharge a juror for good cause and substitute an alternate juror even after the final submission of the case to the jury. (*People* v. *Collins* (1976) 17 Cal.3d 687, 691-694 [131 Cal.Rptr. 782, 552 P.2d 742].) The only temporal limitation is set forth in section 233 of the Code of Civil Procedure (formerly section 1123 of the Penal Code), which states that a juror may be discharged "before the jury has *returned* its verdict to the court."[7] (Italics added.)

▉ The question, then, is what constitutes the *return* of the verdict. Is it, as defendant argues, the submission of the written verdict forms or the clerk's reading of the forms? We think not.

The statutory provisions concerning jury verdicts do not explicitly clarify when the verdict is "returned." Penal Code section 1147 states that "[w]hen the jury have *agreed* upon their verdict, they must be conducted into court . . . ." The defendant in a felony case must appear in court "before the verdict is *received* . . . ." (Pen. Code, § 1148, italics added.) "When the jury appear they must be asked by the court, or clerk, whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, *declare* the same." (Pen. Code, § 1149, italics added.)

It has been said that the oral declaration of the jurors, not the submission of the written verdict forms, constitutes the *return* of the verdict. (*People* v. *Lankford* (1976) 55 Cal.App.3d 203, 211 [127 Cal.Rptr. 408], disapproved on another point in *People* v. *Collins*, *supra*, 17 Cal.3d 687, 694; *People* v. *Mestas* (1967) 253 Cal.App.2d 780, 786 [61 Cal.Rptr. 731].) Yet, because the defendant has a constitutional right to a unanimous jury (Cal. Const., art. I, § 16), Penal Code sections 1163 and 1164 clarify that there is no verdict absent unanimity in the oral declaration. (See *People* v. *Thornton* (1984) 155 Cal.App.3d 845, 858-859 [202 Cal.Rptr. 448].) Section 1163 provides: "When a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party, in which case they must be severally asked whether it is their verdict, and if anyone answer in the negative, the jury must be sent out for further deliberation." And section 1164, subdivision (a), provides: "When the verdict given is receivable by the court, the

---

[7]Code of Civil Procedure sections 233 and 234 apply to criminal as well as civil juries. (Code Civ. Proc., § 192.)

clerk shall record it in full upon the minutes, and if requested by any party shall read it to the jury, and inquire of them whether it is their verdict. If any juror disagrees, the fact shall be entered upon the minutes and the jury again sent out; but if no disagreement is expressed, the verdict is complete, and the jury shall, subject to subdivision (b), be discharged from the case."

 ██ Because the verdict is not "complete" if any juror dissents from the verdict as rendered, the trial court is empowered, indeed obligated, to reconvene the jury for further deliberation. (*People* v. *Superior Court* (*Thomas*) (1967) 67 Cal.2d 929 [64 Cal.Rptr. 327, 434 P.2d 623, 25 A.L.R.3d 1143]; *Chipman* v. *Superior Court* (1982) 131 Cal.App.3d 263, 266 [182 Cal.Rptr. 123].)[8] We must conclude that in such circumstances no verdict has been "returned." Until the verdict is complete the trial court is equally empowered to reconvene the jury for reconsideration of its verdict and to discharge a juror for good cause and order the jury to begin deliberations anew.[9]

### 2. Cause to Remove

 Cheryl Jones's behavior was first called to the court's attention during trial. Another juror, Katherine Oroszi, informed the court that juror Jones seemed to know people in the courtroom. The prosecutor asked that Jones be removed, and the trial court conducted an inquiry by questioning Jones. She denied knowing anyone in the audience. No further action was taken.

A week later, after the jury was polled and then sent back for further deliberations, the jury foreman sent three separate notes to the court declaring that juror Jones refused to deliberate. The trial court questioned Jones, who denied she was refusing to discuss the case. Yet, later that day, the foreman again sent a note charging that Jones was refusing to discuss her change of mind. The trial court then questioned the foreman, who expressed doubt that further deliberations would produce a verdict. The foreman further reported that Juror Oroszi had reported to him that she had seen Jones "in the company of gang members and friends of Green." After the foreman left the courtroom, the bailiff informed the court that he had observed facial communication between Juror Jones and defendant's sister:

---

[8]In other situations, too, the trial court is empowered to reconvene the jury for reconsideration of the verdict if no "complete" verdict has yet been rendered. (*People* v. *Hernandez* (1985) 163 Cal.App.3d 645, 657 [209 Cal.Rptr. 809] [verdict received on only one count] and cases cited.)

[9]Defendant also argues that substitution of a juror after the jury returns its verdict denies his constitutional right to an impartial and unanimous jury. Because we have concluded the substitution here occurred *before* the jury returned its verdict, this argument fails.

"[T]hey looked at each other directly in the face and they both smiled at each other and kind of raised their eyebrows."

On the following court day the trial court began an inquiry into the report that Jones had been seen in the company of friends of defendant. The court questioned Jurors Oroszi, Gonzalez and Jones but found that the accounts given by Jurors Oroszi and Gonzalez conflicted with the statements of Jones. Accordingly, the court broadened the inquiry and questioned the remaining jurors to see if Jones had mentioned to any of them her acquaintance with defendant's family. Several jurors reported hearing Jones say that she rode home on the bus from court with defendant's mother and sister. They also heard Jones identify members of defendant's family sitting in the courtroom.

Yet, when the trial court questioned Jones about these statements to her fellow jurors, Jones denied saying anything about defendant's family. She admitted riding on the bus with defendant's mother, but she claimed she had never mentioned this to the other jurors.

The trial court decided to remove Jones: "This juror reportedly gave information to other jurors about the defendant's family that I find difficult to believe could have been deduced from simply making observations in the courtroom. Be that as it may, this juror also told me that she never said any of these things to these other jurors. So I either have to believe her as opposed to four or five other jurors or I have to disbelieve her. I really think that's what it boils down to. Whether or not anybody told her this, whether or not she made it up out of old [whole] cloth, why would these other jurors be saying this juror is telling us in this courtroom and this juror to come in here and I told her nothing. Based on that I cannot credit this juror in her answers to me because I don't know what answer she is telling me she is being truthful and which one she is not, and under the circumstances I don't think I have any choice but to remove her. There is obviously at this point the possibility that there was contact on this bus. She admitted being on the bus with the mother and the sister. Now, whether there was other contact or contact in other areas, I don't know, but I'm never going to find out from her." We find no error in this ruling.

■ A juror may be substituted if "upon . . . good cause shown to the court [the juror] is found to be unable to perform his [or her] duty. . . ." (Pen. Code, § 1089; Code Civ. Proc., §§ 233, 234.) The determination of "good cause" lies within the discretion of the trial court. (*People* v. *Price*, (1991) 1 Cal.4th 324, 400 [3 Cal.Rptr.2d 106, 821 P.2d 1192]; *People* v. *Abbott* (1956) 47 Cal.2d 362, 371 [303 P.2d 730].) That discretion is limited, however, in that the juror's inability to perform the functions of a juror must

appear in the record as a demonstrable reality. (*People* v. *Collins*, *supra*, 17 Cal.3d at p. 696; *People* v. *Thomas* (1990) 218 Cal.App.3d 1477, 1484 [267 Cal.Rptr. 865].)

 Defendant complains that the mere fact that Jones was untruthful in her statements to the court does not amount to good cause for removal. Even accepting this proposition *arguendo*, we do not read the trial court's ruling to mean that Jones was removed simply because she was untruthful. Rather, as we read the trial court's decision, the trial court found reason to suspect that Jones had had contact with members of defendant's family. That suspicion is amply supported by the evidence that Jones rode the bus with defendant's mother and sister, that she could identify family members in the audience, and that she exchanged smiles and knowing glances with those same people. Jones's contact called into question her ability to render a fair and unbiased verdict, but because Jones gave false denials to the court, the court was unable to ascertain the extent, nature, or effect of the contact. The trial court was entitled to infer from Jones's untruthfulness that Jones had in fact lost her impartiality and, hence, was unable to perform her duty as a juror. (See *In re Hitchings* (1993) 6 Cal.4th 97, 119-121 [24 Cal.Rptr.2d 74, 860 P.2d 466].)[10]

## B. *Eugene Adams*

More troubling than Juror Jones is Juror Eugene Adams, who served as foreman of the jury during the first round of deliberations. (When the jury was reconvened after Jones was removed, another juror was selected foreman.)

### 1. *Bias against Defendant*

 The impartiality of Juror Adams was first called into question before the verdict was rendered. Defense counsel reported that the boyfriend of a friend of defendant's sister had overheard Juror Adams in a bar commenting about defendant's guilt. The trial court ruled that it could take no action without hearing directly from the boyfriend. This point was never pursued further.[11]

Later, however, during the inquiry about Cheryl Jones, Jones accused Adams of saying defendant was guilty and "I could go out there and shoot

---

[10]The Attorney General argues that the trial court's decision to remove Jones is justified by the evidence that she refused to deliberate after the jury was sent back. The trial court did not rely upon that reason and we find it unnecessary to discuss that issue.

[11]Even before that, Juror Oroszi, who reported seeing Cheryl Jones in the company of defendant's family, added to her report that Juror Adams had expressed opinions about the credibility of witnesses. The trial court questioned Adams, who denied saying such things. No further action was taken.

him and stuff like that." When Adams was questioned (about Jones's misconduct), defense counsel asked about the statements attributed to Adams himself. Adams admitted saying, "it was a terrible thing for somebody to do anything like that," but he stated his belief that the evidence showed defendant had committed the crimes. He did not make up his mind until after the case was submitted to the jury.

Defendant moved to remove Adams for bias and the trial court took the matter under submission. The next day defense counsel made an offer of proof that Cheryl Jones would testify Adams said he knew defendant was guilty the moment he saw him.

In the midst of discussions, the court received word that the jury had reached a verdict. The court then denied defense counsel's request for a hearing on the competency of Adams, reasoning that the issue could be raised on a motion for new trial.

In his motion for new trial defendant submitted the declaration of juror Haywood, who said that "[w]hen the jurors entered the jury room to start deliberations and before a foreman was chosen, juror Eugene Adams stated that he knew the defendant was guilty the moment he looked at him."

This declaration was supported by the declaration of Cheryl Jones, who repeated her earlier accusations against Adams: "When the jurors entered the jury room to start deliberations and before a foreman was chosen, juror Eugene Adams stated the following in front of all jurors: [¶] a. he knew that defendant was guilty the minute he saw him in court before the trial began and before he had heard any evidence; . . . [and] [¶] c. he wished the judge would let him go back to his place so he could get his piece and bring it back if the judge would let him take care of the job, that is, shoot Paul Green himself."

In response, the prosecution filed an affidavit of Adams, stating: "After all the evidence was received and I heard the arguments of the lawyers and the judge's instructions, I was strongly convinced Paul Green was guilty. [¶] On a number of occasions during deliberations, I emphatically told that to the other jurors. [¶] I never made the statement 'I knew Paul Green was guilty before the evidence.' That isn't true. I didn't finally decide he was guilty until after the trial was over and we had heard the arguments and the law. [¶] I don't remember saying 'I knew he was guilty the minute I saw him.' That also is not true. I had no feeling about Mr. Green's guilt or innocence except as a result of what happened at trial. [¶] If I said 'I knew he was guilty the minute I saw him', I meant to express how strongly I believed he was guilty,

and not when I made up my mind. I did not make up my mind that Mr. Green was guilty based on what he looked like, but rather based on the evidence and the law."

At the hearing on the motion for new trial, Jurors Haywood, Jones and Adams all testified and reiterated the substance of their declarations.

The trial court denied the motion for new trial. The court acknowledged that perhaps a hearing on Adams should have been held earlier: "Now, with respect to counsel's argument that the court should have had a hearing with Mr. Adams at the time that the incident was raised by Miss Jones. In retrospect it probably should have happened. Although, at this point I don't see what inquiry I could have made that was not made in the for [sic] new motion. I don't believe I could have inquired further into the juror's state of mind as to why he said what he said under 1150 of the Evidence Code."

The court found that Juror Adams had not prejudged the case against defendant: "[A] juror should not go in there with a fixed opinion and try to steam roll all other jurors with it. However, the case law is replete with indications that jurors are only human. There is a preference in the law and that's partially explained by the reason why we have 1150 that the rough and tumble, as I would characterize it, as jury deliberations should be open and free and jurors should be made to make outlandish expressions . . . . That is human nature. And anybody who studies psychology knows that's what happens in groups sometimes. It's clear, however, that if a juror purports to bring in outside information, for example, giving erroneous or bringing in outside information from dictionaries or telling people that I know the law and the law is this, blah, blah, blah. And it's not law that's been given by the judge, that is improper and is a basis for granting the new trial. We have nothing of that in this case. We have a person who's saying he knew he was guilty the moment he laid eyes upon him. Obviously other statements made by Mr. Adams during the jury deliberation process show that he was a pretty opinionated and hard headed person, but at this point I'm not prepared to find that that statement in and of itself indicates that he was bias[ed] from the outset in this case."

We affirm that ruling. Adams's statement (that he knew defendant was guilty the moment he saw him) came after the evidence had been taken, as the jurors were commencing deliberations. It therefore is consistent with Adams's explanation that he formed his opinion *after* hearing the evidence. Indeed, the statement could be interpreted as merely post hoc boastfulness ("I knew it all the time"). The trial court was entitled to assess the credibility of the witnesses and to accept Adams's explanation. The court's finding that Adams was not biased is supported by the record and must be upheld.

## 2. *Absence of a Hearing*

■ Defendant argues that the trial court should have conducted a hearing *before* the verdict was rendered to determine whether Juror Adams had committed misconduct in commenting on defendant's guilt. Inasmuch as the trial court conducted an extensive hearing on the motion for new trial and concluded that Adams's statements did not show a preexisting bias against defendant, the claim of procedural error is moot. The inquiry on the motion for new trial was the same inquiry as would have been made prior to the verdict. The trial court's ruling rendered harmless any error in failing to conduct an earlier inquiry.[12]

## 3. *Special Expertise*

■ In his motion for new trial defendant raised the additional ground that Juror Adams had committed misconduct by injecting his own expertise into the deliberations. Juror Haywood stated in his declaration and testified at the hearing that Adams had shown the jurors his business card printed with the name "Sidewinder Investigations." Cheryl Jones declared and testified that Adams claimed to be a private criminal investigator who had investigated cases and who knew from his experience that defendant was guilty. Brenda Gonzalez testified that Adams mentioned he was an investigator. Juror Adams in his own declaration submitted by defendant stated that he had had the "Sidewinder" cards made up for elderly people in his neighborhood "who have been beaten up and robbed by young black men"; that when friends reported assaults to him he would try to find the person responsible.

In a counterdeclaration submitted by the prosecution, however, Adams denied being an investigator. He explained that he had not read the defense affidavit carefully before signing it.

At the hearing, Adams testified that he showed his "Sidewinder" card only to one juror (Alley), not to any others. Although he did investigate one crime that occurred in his building, he did not discuss that investigation with the jurors, and he did not tell the jurors he was a private investigator.

In denying the motion for new trial, the trial court found that Adams had not deliberately concealed his "vigilante activity." The court noted that on voir dire Adams had declared himself to be a "security supervisor" and no

---

[12]Defendant argues that had the inquiry been conducted while the jurors were still convened, all jurors would have been available for examination, whereas on the motion for new trial defendant was at the mercy of the jurors' spirit of cooperation.

one questioned him about it. Impliedly, then, the court found no misconduct, and we affirm that ruling. Although there was conflicting evidence on the extent to which Adams displayed his "Sidewinder" card to the jury, the only evidence that Adams claimed to have special knowledge or in any way injected outside information into the deliberations came from Cheryl Jones. Haywood did not hear Adams say anything about his experiences as an investigator. In light of the earlier finding of Jones's untruthfulness, the court was entitled to discount her statements. Even if Adams had made such claims to Jones, Jones was later discharged from the jury. The record supports the trial court's implied finding that Adams did not inject his own expertise into the deliberations.

### 4. *Ex-felon*

 In the course of the hearing on the motion for new trial concerning the alleged misconduct by Adams, the prosecution learned that Adams had a criminal record, including a felony conviction. The trial court was then faced with a new ground for a new trial: Adams's ineligibility to serve as a juror.[13]

At the hearing on the motion for new trial Adams acknowledged that he had been arrested for assault while in the Army, in 1948, after he got into a fight. He was also arrested for burglary in 1953 and 1956 and for robbery in 1954. He described the latter arrests as rousts of a young Black man, typical for the times. He was never prosecuted for those offenses. However, in 1965 he was convicted of passing bad checks (Pen. Code, § 476a) and served a prison sentence therefor. He completed parole successfully, but was never pardoned.

Adams explained that his wife filled out the jury questionnaire for him and he signed it without reading it. Although his wife knew of his criminal conviction she would not have understood the question on the jury form.

At the outset we acknowledge the long-standing rule that a defendant who knew about a juror's incompetency or who should have discovered the incompetency on voir dire may not raise the objection after trial. (*People* v. *McFarlane* (1903) 138 Cal. 481, 490 [71 P. 568]; *People* v. *Mortier* (1881) 58 Cal. 262, 267; *People* v. *Huston* (1958) 163 Cal.App.2d 363, 366 [329 P.2d 334].) The Supreme Court recently reaffirmed that rule of waiver in *People* v. *Hill* (1992) 3 Cal.4th 959, 985-986 [13 Cal.Rptr.2d 475, 839 P.2d 984]. Although the prosecutor raised the point below, the Attorney General

---

[13]Code of Civil Procedure section 203, subdivision (a)(5) makes ineligible for jury service "[p]ersons who have been convicted of malfeasance in office or a felony, and whose civil rights have not been restored."

does not rely on this rule on appeal. The Attorney General concedes that defendant had no reason to suspect that Juror Adams was ineligible to serve, and the Attorney General acknowledges that the defendant cannot waive what has been concealed.

Indeed, it is the concealment that is the root of the issue. In the present case, unlike those early cases finding waiver, Juror Adams gave false information on his jury questionnaire and concealed during voir dire his prior involvement in an assault. Juror concealment constitutes juror misconduct to which an objection may be raised after trial. (*People* v. *Castaldia* (1959) 51 Cal.2d 569, 572 [335 P.2d 104]; *People* v. *Diaz* (1984) 152 Cal.App.3d 926, 932-934 [200 Cal.Rptr. 77].)

The Attorney General concedes, as he must, that Adams's concealment of his felony conviction was misconduct. (E.g., *People* v. *Price, supra,* 1 Cal.4th 324, 399-401 [juror concealment of felony conviction justified removal for cause]; *People* v. *Farris* (1977) 66 Cal.App.3d 376, 385-387 [136 Cal.Rptr. 45] [juror concealment of past and current criminal activity justified removal].) Juror misconduct raises a presumption of prejudice which "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party . . . ." (*In re Hitchings, supra,* 6 Cal.4th 97, 119, internal quotation marks omitted.)

 The trial court found that Adams, by failing to reveal his felony conviction, gave a false answer during voir dire, "so prejudice is presumed and [a new trial is required] unless it is rebutted by other evidence." However, the trial court declined to decide whether the presumption of prejudice had been rebutted; instead the trial court left it for this court to decide. "Here if Mr. Adams falsely answered this question, the inability to get a correct answer meant that someone would not have been able to knock out a juror who's otherwise ineligible. That is [an affront] to the system and it may well be because it is [an affront] to the system, in other words, a [deliberate] lie that should not be [rebuttable] under any circumstances. Because it appears to me that if that is not the case, then any actual prejudice that was likely to result from this would be more likely to be the prosecution than to the defense, the theory being, of course, that an ex-felon is more likely to harbor some bias against the system, but I'm not prepared to say one way or the other that that is acceptable given that the fact that this [] ineligible juror is [an affront] to the system, but I think any reviewing authorities are going to have to look at the totality of the circumstances and make their own decision." The absence of a trial court finding is of

no consequence, however, as the prejudicial effect of jury misconduct is an independent appellate issue to be adjudicated by the reviewing court based upon the whole record. (*People* v. *Diaz, supra,* 152 Cal.App.3d at pp. 933-934.)

 The Attorney General urges this court to find the presumption of prejudice rebutted by virtue of the fact that ex-felons are more likely to be biased against the system that punished them and *in favor* of the defendant on trial. We conclude, however, that the Attorney General's assumption about the bias of ex-felons is unduly narrow.

It is true that the Supreme Court, in rejecting an equal protection argument against exclusion of ex-felons from jury service, attributed a pro-defendant bias to ex-felons. In finding a rational basis for the exclusion, the court reasoned as follows: "The Legislature could reasonably determine that a person who has suffered the most severe form of condemnation that can be inflicted by the state—a conviction of felony and punishment therefor—might well harbor a continuing resentment against 'the system' that punished him and an equally unthinking bias in favor of the defendant on trial, who is seen as a fellow underdog caught in its toils. Because these antisocial feelings would often be consciously or subconsciously concealed, the Legislature could further conclude that the risk of such prejudice infecting the trial outweighs the possibility of detecting it in jury selection proceedings." (*Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 101 [154 Cal.Rptr. 734, 593 P.2d 595].)

But the Supreme Court's finding of a rational basis for excluding ex-felons from jury service ought not to be used in the present context of evaluating the potential for prejudice from the juror's concealment of his ex-felon status. As defendant points out, the Legislature has since 1851 concluded that ex-felons are unfit for jury service. (See *People* v. *Karis* (1988) 46 Cal.3d 612, 633 [250 Cal.Rptr. 659, 758 P.2d 1189]; see also Cal. Const., art. VII, § 8 [persons convicted of perjury, bribery or other high crimes ineligible for jury service].) It may be that the Legislature had in mind more than simply the potential bias against "the system." It may be that the Legislature was also concerned that an ex-felon, having himself been punished, would be quick to seek punishment for others. In light of the legislative determination that ex-felons should not be entrusted with the duties of jurors, the presumption of prejudice that arises from juror Adams's concealment of his ex-felon status ought not to be rebutted by an *assumption* that an ex-felon would favor the defendant. Moreover, the courts have said that the presumption of prejudice is rebuttable by a showing *on the record*. As defendant points out, a review of the record here would suggest that the

Attorney General's assumption about ex-felons is wrong; juror Adams exhibited no bias *in favor* of defendant.

Despite our rejection of the Attorney General's analysis, we nonetheless undertake an independent determination of whether the presumption of prejudice has been rebutted. The factors guiding our analysis include the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued. (*People* v. *Diaz, supra,* 152 Cal.App.3d at p. 935; *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171].) The sufficiency of the evidence of guilt is not part of the inquiry. (*Diaz, supra;* see *People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91]; *People* v. *Wheeler* (1978) 22 Cal.3d 258, 283 [148 Cal.Rptr. 890, 583 P.2d 748].)

In *People* v. *Diaz, supra,* 152 Cal.App.3d 926, a juror concealed during voir dire that she had been the victim of an assault, the same crime for which the defendant was on trial. In evaluating whether the presumption of prejudice had been rebutted, the court first found that the defendant had been deprived of his right to obtain an unbiased jury through the voir dire and peremptory challenge process. Second, the court found a high probability that actual prejudice may have ensued—first, because it was likely that the defendant's lawyer would have established a basis upon which to challenge the juror, and, second, because the juror's election as foreperson raised the possibility that the other jurors were influenced by her views.

 In the present case, as in *Diaz,* the juror's concealment of crucial information undermined the jury selection process. Had Juror Adam's felony conviction been known, the trial court would have been obligated to strike him from the jury panel; no peremptory challenge would have been necessary. It is, therefore, not merely probable, it is a virtual certainty that Adams would have been excluded from the jury had Adams revealed his ex-felon status.

In *Diaz,* however, the misconduct of the juror was especially serious, as what the juror had concealed was her potential bias against the defendant. The defendant in *Diaz* was thereby deprived of his right to an *unbiased* jury. In contrast, the misconduct of Adams was the concealment of his ineligibility to serve on a jury. The trial court seems to have concluded that the concealment was not deliberate. As the waiver cases indicate, ineligibility of a juror is not a fatal defect. (E.g., *People* v. *Evans* (1899) 124 Cal. 206, 210 [56 P. 1024] [juror was not a citizen].) And we can find no indication in the record that Adams's status as an ex-felon affected his ability to be impartial.

In fact, as we have already discussed, the trial court expressly found after an extensive inquiry that Adams had no actual bias against defendant.

In light of all the circumstances, and especially in light of the trial court's latter finding that Adams was in fact an impartial juror, we conclude that the presumption of prejudice was rebutted. The record shows no actual harm from the misconduct.

C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VIII.-X.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is modified to specify that the two terms of life imprisonment without possibility of parole shall run concurrently. As so modified, the judgment is affirmed.

Stein, J., concurred.

**NEWSOM, Acting P. J.**—I respectfully dissent. I would reverse the judgment for misconduct by Juror Adams in his concealment of a felony conviction which rendered him ineligible to serve on the jury.

The defendant in a criminal trial has the constitutional right to have the charges against him or her tried by a fair and impartial jury. (*In re Hitchings* (1993) 6 Cal.4th 97, 110 [24 Cal.Rptr.2d 74, 860 P.2d 466]; *People v. Hord* (1993) 15 Cal.App.4th 711, 724 [19 Cal.Rptr.2d 55]; *People v. Blackwell* (1987) 191 Cal.App.3d 925, 929 [236 Cal.Rptr. 803].) " ' "The right of unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to trial by jury guaranteed by the Constitution." ' " (*People v. Diaz* (1984) 152 Cal.App.3d 926, 933 [200 Cal.Rptr. 77]; see also *People v. Ryner* (1985) 164 Cal.App.3d 1075, 1081 [211 Cal.Rptr. 140].) Concealment or false answers by a juror during voir dire, whether inadvertent or intentional, interferes with the right of a criminal defendant to conduct voir dire for the purpose of discovering bias or impartiality, and constitutes serious misconduct. *In re Hitchings, supra,* 6 Cal.4th at p. 112; *People v. Blackwell, supra,* 191 Cal.App.3d at pp. 929-930; *People v. Diaz, supra,* 152 Cal.App.3d at p. 935.)

The trial court found, and the majority has affirmed, that Juror Adams committed obvious misconduct by concealing the fact of his 1965 felony

*See footnote, *ante,* page 1001.

conviction, which deprived appellant of the right to properly conduct voir dire and exercise his peremptory challenges to obtain an impartial and unbiased jury. (Cf. *In re Hitchings, supra*, 6 Cal.4th at p. 112; *People v. Blackwell, supra*, 191 Cal.App.3d at p. 929.) The majority also acknowledges, and again I agree, that due to the misconduct appellant remained unaware of the resulting lack of capacity of Adams to sit upon the jury, which would have required his dismissal and replacement with another juror without the necessity of a peremptory challenge. (Cal. Const., art. VII, § 8; *People v. Karis* (1988) 46 Cal.3d 612, 633 [250 Cal.Rptr. 659, 758 P.2d 1189].) Where I part company with the majority is in its conclusion, unsubstantiated in my view, that the misconduct was not prejudicial to appellant.

Juror misconduct, while not reversible error per se, raises a presumption of prejudice. (*People v. Holloway* (1990) 50 Cal.3d 1098, 1108 [269 Cal.Rptr. 530, 790 P.2d 1327]; *People v. Hill* (1992) 3 Cal.App.4th 16, 34 [4 Cal.Rptr.2d 258]; *People v. Ryner, supra*, 164 Cal.App.3d at p. 1082.) The burden is on the prosecution, not the defendant, to rebut that presumption. (*People v. Underwood* (1986) 181 Cal.App.3d 1223, 1239 [226 Cal.Rptr. 840].) The presumption created by juror misconduct " 'may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party' " resulting from the misconduct. (*People v. Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127]; see also *In re Hitchings, supra*, 6 Cal.4th at p. 119; *People v. Ryner, supra*, 164 Cal.App.3d at p. 1082.) "Some of the factors to be considered when determining whether the presumption has been rebutted are as follows: the strength of the evidence that misconduct occurred; the nature and seriousness of the misconduct; whether the prosecutor's burden was lightened by the misconduct; the effect of the misconduct upon the defense case; and the probability that actual prejudice may have ensued." (*People v. Ryner, supra*, 164 Cal.App.3d at p. 1082; see also *People v. Harper* (1986) 186 Cal.App.3d 1420, 1427 [231 Cal.Rptr. 414]; *People v. Sutter* (1982) 134 Cal.App.3d 806, 820 [184 Cal.Rptr. 829].) An "objective evaluation of the misconduct" must be made "in light of the entire record. [Citations.]" *People v. Ryner, supra*, 164 Cal.App.3d at p. 1083; see also *People v. Hill, supra*, 3 Cal.App.4th at p. 35.)

Here, the prosecution presented no affirmative evidence to rebut the presumption of prejudice, and I find no such evidence in my review of the record. The misconduct was not discovered until after the verdict was rendered, and the impact of the concealment by Juror Adams of his ineligibility to serve is essentially impossible to assess. The prosecution's burden of rebuttal hence must be considered "almost insurmountable." (*People v.*

*Harper, supra,* 186 Cal.App.3d 1427.) "[C]oncealment by veniremen during voir dire uncovered before jury deliberations inherently involves prejudicial misconduct which perhaps cannot be rebutted by either the People or a review of the entire record because of its subjective, intangible and subliminal nature. [Citation.]" (*People* v. *Diaz, supra,* 152 Cal.App.3d 926, 937, fn. 5.) The suppression of material information by juror Adams during voir dire also "constitutes implied bias" and "creates an inference" that he "prejudged the case." *In re Hitchings, supra,* 6 Cal.4th at p. 120; see also *People* v. *Price* (1991) 1 Cal.4th 324, 401 [3 Cal.Rptr.2d 106, 821 P.2d 610].) I think the record reaffirms rather than rebuts the inference of bias on the part of Adams and the presumption of prejudice which arose from his misconduct. His comments upon appellant's guilt before deliberations commenced and his activities as an apparent neighborhood vigilante, when taken together with his concealment of his status as a convicted felon, convince me that his impartiality was at best highly debatable.[1]

In addition to Adams's concealment of critical information which raised unresolved doubts as to his impartiality, it must be remembered that he was incompetent as a convicted felon to perform the duties of a juror. Our high court has declared that a verdict rendered with the participation of a juror unfit or incompetent to serve "must be reversed. [Citations.]" (*People* v. *Burgener* (1986) 41 Cal.3d 505, 520 [224 Cal.Rptr. 112, 714 P.2d 1251].)[2] We know, at least, that Adams was unquestionably ineligible to act as a juror, and had he not concealed his felony conviction during voir dire would not have served on the jury. Of course, with disclosure of his ineligibility coming only after the verdict was reached, we cannot easily resolve the issue of prejudice by reference to the record. But in my view, the concealment of information by Adams which, I believe, demonstrates his bias, coupled with his incompetence and a record which fails to establish that appellant was afforded the right to a fair and impartial jury, compels reversal of the judgment. (Cf. *People* v. *Blackwell, supra,* 191 Cal.App.3d at p. 931.)

A petition for a rehearing was denied February 21, 1995, and appellant's petition for review by the Supreme Court was denied April 13, 1995. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

[1] I do not challenge the trial court's findings, which we have upheld on appeal, that Adams did not commit misconduct by pronouncing his belief in appellant's guilt or in exhibiting his "Sidewinder Investigations" card, but merely consider such evidence in reviewing the record as it relates to the issue of rebuttal of the presumption of prejudice.

[2] In *Burgener,* the lack of fitness stemmed from claimed intoxication rather than conviction of a felony, but I consider the distinction inconsequential to the principle that a verdict obtained with the participation of an incompetent juror must be subject to reversal absent compelling evidence of lack of prejudice.