Paul GREEN, Petitioner–Appellant,

v.

Theo WHITE, Warden, Respondent–Appellee.

No. 99–17124.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 16, 2000

Filed Nov. 13, 2000

Michael Satris, Law Offices of Michael Satris, Bolinas, California, for the petitioner-appellant.

Ronald S. Matthias, Supervising Deputy Attorney General, and Herbert Wilkinson, Deputy Attorney General, San Francisco, California, for the respondent-appellee.

Before: LAY,[1] D.W. NELSON and THOMAS, Circuit Judges.

1. The Honorable Donald P. Lay, Senior Unit-   ed States Circuit Judge for the Eighth Circuit,

**LAY, Circuit Judge:**

Paul Green appeals the district court's denial of his petition for a writ of habeas corpus following his state court conviction for two counts of first degree murder and other charges in connection with a drive-by shooting. Green asserts three grounds upon which a writ of habeas corpus should be granted: (1) a juror, Eugene Adams, engaged in prejudicial misconduct by concealing a felony conviction that would have disqualified him from jury service under California law; (2) a new juror was substituted for the lone holdout juror; and (3) accumulated prejudice from several errors denied him a fair trial. Based on the misconduct of the juror Adams,[2] we reverse the district court's decision and remand the case with instructions.

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d)(1), we can only issue a writ of habeas corpus if the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Section 2254(d)(2), however, allows this court to issue a writ of habeas corpus if the state court's decision "was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[3] 28 U.S.C. § 2254(d)(2).

We reverse the district court's denial of the writ of habeas corpus under § 2254(d)(2). We find that the state trial court as well as the California Court of Appeals made factual assumptions not supported by the evidence; we also find that the state trial court abdicated its factfinding responsibility and left it to the appeals court to determine whether the petitioner had shown bias by reason of the misconduct of the juror Adams.

## Background

Eugene Adams served as the first jury foreman in Green's trial. Adams had several encounters with the law, including a felony conviction for passing bad checks in 1965, a conviction for assault, and an arrest for robbery. As a result of his felony conviction, Adams was not eligible to serve as a juror in California. *See* Cal.Code of Civ. Proc. § 203(a)(5). Because of a pattern of misleading statements, however, he concealed his criminal history from the trial court, and sat on Green's jury.

The jury questionnaire form sent to Adams before trial asked whether he had ever been convicted of a felony; Adams replied that he had not. When Adams was questioned about this misstatement at the post-trial hearing, he gave contradictory testimony. First, he said that his wife filled out the form and answered the questions. When asked why his wife incorrectly filled in the questionnaire, he replied "you have to understand my wife is 71 years old and she doesn't know the difference between misdemeanor and felonies." *See* Excerpts of Record (ER) at 322–323. Immediately thereafter, he contradicted these statements, observing:

> Q.  So she read [the jury questionnaire] to you and you answered it with her, is that right?
>
> A.  I know she did.

---

**2.**  Due to our reversal on this issue, we need not consider Green's other arguments.

**3.**  As an analytical matter, the relationship between § 2254(d)(2) and § 2254(e)(1) is not entirely clear. Both appear to address state court factual findings. We need not define the precise relationship, however, as the standard of review appears to be clear error under both statutory provisions. *See Jeffries v. Wood,* 114 F.3d 1484, 1500 (9th Cir.1997) (*en banc*) (holding that a state court's factual decision is unreasonable if the decision is "clearly incorrect"); *Torres v. Prunty,* 223 F.3d 1103, 1107 (9th Cir.2000) (holding that (d)(2) cases are reviewed for clear error).

Q. And she asked you and she read to you the question, "Have you ever been convicted of a felony?" Isn't that true?

A. I am quite sure she went down through everything.

Q. And she put down the answers you gave her, is that right?

A. Apparently.

*Id.* at 323. Later he reiterated this point, stating:

Q. Did you instruct her as to any of the answers that should be given?

A. Yes. She would—you mean the jury questionnaire?

Q. Yes, sir.

A. Well, she read down the lines and she was just checking them off.

Q. And she checked them off based on your answers?

A. Yes, more or less.

*Id.* at 386.

Adams' second falsehood[4] occurred at voir dire, where potential jurors were asked the following question: "Have any of you or any member of your family or any close friends to your knowledge ever been arrested, charged or arrested for these types of crimes similar to in case [sic], shootings, murders, any kinds of assaults?" *Id.* at 56. Adams had been convicted of assault while in the Army and served six months in the brig. He did not reveal this fact.

In addition to these false statements, Adams was involved in several incidents that impeach his impartiality. When the jury retired, at least two jurors heard Adams say something to the effect that he knew Green was guilty the moment he saw him. *See id.* at 33–34, 39–40. At the evidentiary hearing before the state trial court, Adams had a variety of responses to this accusation. First he claimed, "I never made the statement 'I knew Paul Green was guilty before the evidence,'" and then, "I don't remember saying 'I knew he was guilty the minute I saw him,'" and finally, "If I said 'I knew he was guilty the minute I saw him.' I meant to express how strongly I believed he was guilty." *Id.* at 82. His post-trial testimony clearly contradicted the statements in his declaration:

Q. Do you recall saying anything to the effect that you would like to shoot Mr. Green?

A. I would like to shoot him?

Q. Yes, sir.

A. No, I don't

. . . .

Q. Did you ever make a statement to [a particular juror] to the effect that "I knew Paul Green was guilty the minute I saw him"?

A. Well, I am not a Rhodes scholar, but that would be stupid; no.

---

4. A further troubling incident occurred at voir dire. Adams apparently is nicknamed "Sidewinder." He owns business cards with his phone number and the legend "TROUBLE . . . CALL SIDEWINDER." Several jurors said that Adams showed them his business cards and claimed to investigate crimes for friends who were crime victims. Again, after the verdict, he provided contradictory explanations of his behavior. In the first of three declarations he signed, he claimed:

[O]n a number of occasions my friends have reported these assaults to me. . . . As a result of this I had business cards made up with the name "Call Sidewinder" in an effort to do whatever I could to help my friends who were being assaulted. . . . On occasion, after learning that a friend was assaulted, I would go to the area of the assault and try and find the individual responsible for the crime.

ER at 36–37. Later Adams backed away from this statement, saying in his third declaration (prepared for the State): "I never 'investigated' any crimes, nor went to the scene of a crime outside the building where I worked. None of the people involved in these incidents were relatives or close personal friends, but were people I met because of where I worked." *Id.* at 81. This response was calculated to show he did not lie a second time at voir dire, because Adams did not respond to the following question: "Have any of you or any member of your family, or any *close friends* to your knowledge ever been a complaining witness or a victim in a case of this kind?" *Id.* at 56 (emphasis added).

Q. The question is—so your answer is that you did not say that?

A. I did not tell [a particular juror] that.

. . . .

Q. Did you ever make a statement to anybody in the jury during the deliberations that "I knew Paul Green was guilty the minute I saw him"?

A. I made that statement when the trial was over; when the trial was over.

Q. To whom did you make it?

A. In the jury room.

Q. Who did you make that statement to?

A. To everybody.

*Id.* at 373–374.

Juror Jones (the juror who was later dismissed) claimed to overhear Adams say he wished the "judge would let him go back to his place so he could get his piece" and shoot Green. *Id.* at 40. In response to this charge, he testified:

Q. Okay. Did you ever say something like you'd like to shoot him down if you had a gun yourself?

A. Shoot him down? I think I did make a statement and say that it's a shame that, but I didn't make it to the jury, but I did—I did say something to the effect it's a shame that this state has to go through all of this and it just seems like the wrong people have too many rights. It just seemed that way. I didn't say this to the jury.

. . . .

Q. Did you ever mention something like if you had a gun you would shoot Paul Green yourself or something like that?

A. I mentioned something like which I shouldn't have mentioned that that should be done.

*Id.* at 72, 74.

### State Court Proceedings

Although the state trial court found Adams' behavior upsetting, it refused to order a new trial. Regarding Adams' false answer about his felony conviction, the trial court believed it was an open question whether his civil rights had been restored, thus: "[I]t may well be that Mr. Adams question had it been asked, have you ever been convicted of a felony and not had your civil rights restored.... In other words, it may not be a false answer to the question if his civil rights had been restored." *Id.* at 245. Assuming they had not, the trial court said:

[O]ne would have to conclude that his answer to this question was false. So he gave a false answer to a specific question in voir dire so prejudice is presumed.... Here if Mr. Adams falsely answered this question, the inability to get a correct answer meant that someone would not have been able to knock out a juror who's otherwise ineligible. That is in a front (sic) to the system.... But I'm not prepared to say one way or the other that this is acceptable given that the fact that this ... ineligible juror is in a front (sic) to the system, but I think any reviewing authorities are going to have to look at the totality of the circumstances and make their own decision.

*Id.* at 245–46.

On the question of bias, the trial court believed there were two possible foundations for this argument. The first was Adams' statement that Green was guilty the moment he saw him. The court decided that this statement was explained by the "rough and tumble" of jury deliberations, which should be "open and free and jurors should be able to make outlandish expressions." *Id.* at 248. Thus, this statement did not convince the trial judge that Adams was biased.

The other possible foundation for bias was Adams' misstatements at voir dire. The court rejected this ground, holding: "So, at this point I can't find that Mr. Adams failed to answer honestly or deliberately concealed questions ... for two

grounds. One, the questions were sufficiently vague and two, some of these were so remote that one could expect a juror to forget about them." *Id.* at 247.

The California Court of Appeals affirmed the trial court's judgment. As to Adams' misstatements about his felon status, the appellate court felt, contrary to the trial court's musings, "[h]ad juror Adams' felony conviction been known, the trial court would have been obligated to strike him from the jury panel; no peremptory challenge would have been necessary." *People v. Green,* 31 Cal.App.4th 1001, 1019, 38 Cal.Rptr.2d 401 (1995). Nevertheless, the appellate court upheld the trial court's decision because, "we can find no indication in the record that Adams's status as an ex-felon affected his ability to be impartial. In fact, as we have already discussed, the trial court expressly found after an extensive inquiry that Adams had no actual bias against defendant." *Id.* at 1019–1020, 38 Cal.Rptr.2d 401. On the question of bias, the California Court of Appeals held that Adams' statement that he knew the defendant was guilty the moment he saw him "could be interpreted as merely post-hoc boastfulness ('I knew it all the time')." *Id.* at 1014, 38 Cal.Rptr.2d 401. Hence, the appellate court refused to overturn the trial court's finding that Adams was not biased.[5]

Green's petitions to the California and United States Supreme Courts were summarily denied.

## Analysis

### A.

■ We first must decide whether Adams deliberately lied about his criminal history either on his jury application form or at voir dire. The California Court of Appeals believed that Adams' misstatements were unintentional. The California Appeals Court asserted that the trial court "seems to have concluded that the concealment [on the jury questionnaire] was not deliberate." *See Green,* 31 Cal.App.4th at 1019, 38 Cal.Rptr.2d 401. In fact, the trial court made no such finding, other than determining that Adams' statements were "false" and leaving the implications of this false statement to the reviewing authorities. *See* ER at 245–46. The appeals court finding, we believe, is based on an

---

5. The dissent in the state appellate court is significant. Judge Newsom poignantly wrote:
   *The prosecution's burden of rebuttal hence must be considered "almost insurmountable."* "[C]oncealment by veniremen during voir dire uncovered before jury deliberations inherently involves prejudicial misconduct which perhaps cannot be rebutted by either the People or a review of the entire record because of its subjective, intangible and subliminal nature. [Citation.]" The suppression of material information by juror Adams during voir dire also "constitutes implied bias" and "creates an inference" that he "prejudged the case." I think the record reaffirms rather than rebuts the inference of bias on the .part of Adams and the presumption of prejudice which arose from his misconduct. His comments upon appellant's guilt before deliberations commenced and his activities as an apparent neighborhood vigilante, when taken together with his concealment of his status as a convicted felon, convince me that his impartiality was at best highly debatable.
   In addition to Adams' concealment of critical information which raised unresolved doubts as to his impartiality, it must be remembered that he was incompetent as a convicted felon to perform the duties of a juror. Our high court has declared that a verdict rendered with the participation of a juror unfit or incompetent to serve "must be reversed. [Citations.]" We know, at least, that Adams was unquestionably ineligible to act as a juror, and had he not concealed his felony conviction during voir dire would not have served on the jury. Of course, with disclosure of his ineligibility coming only after the verdict was reached, we cannot easily resolve the issue of prejudice by reference to the record. But in my view, the concealment of information by Adams which, I believe, demonstrates his bias, coupled with his incompetence and a record which fails to establish that appellant was afforded the right to a fair and impartial jury, compels reversal of the judgment.
   *Green,* 31 Cal.App.4th at 1021–1022, 38 Cal. Rptr.2d 401 (emphasis added) (citations omitted).

unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d)(2).

Regarding the voir dire statement, the trial court's finding that its question "have any of you ... been arrested ... [for any] shootings, murders, any kinds of assaults" was vague is not persuasive. The trial court simply asked whether the jurors had been involved in "any kinds of assaults." Although the trial court held an extensive post-trial hearing to examine, *inter alia*, Adams' bias, at no time did Adams testify that he was confused by the question. By deciding that its question was vague without any evidence that Adams was actually confused by the question—especially when the language of the question was clear—the trial court committed clear error. Likewise, the trial court's finding that Adams forgot about his assault conviction was not supported by any evidence. It is hard to imagine that Adams could have forgotten about the six months he spent in the brig for the past assault, no matter how much time had passed. Again, had Adams testified that he had forgotten about his past conviction, the trial court's finding *might* be reasonable—at least enough to avoid clear error. As it is, we have only the trial court's unsupported assertion that Adams forgot about his time in the brig. As the reasons the trial court provided for its decision that Adams did not lie at voir dire were not supported by any evidence, we believe its finding that Adams did not lie at voir dire was clearly erroneous.

As to the jury questionnaire form, although Adams' testimony was at first confused, he eventually revealed (as discussed *supra*) that his wife only read the jury questionnaire to him, while he answered the questions. The only reasonable inference from this testimony is that he falsely answered the question regarding his past felony conviction. Indeed, the trial court decided that Adams gave a "false" answer, but refused to decide the effect of such

answer, instead leaving it to the "reviewing authorities." The state appellate court apparently missed the trial court's finding, and instead relied on Adams' explanation that his "wife filled out the jury questionnaire for him and he signed it without reading it," *Green*, 31 Cal.App.4th at 1016, 38 Cal.Rptr.2d 401, but Adams himself said otherwise.

Hence, it is clear that Adams lied on both his jury questionnaire form and at voir dire. The California Court of Appeals decision that the presumption of prejudice was overcome was "based on" this erroneous factual finding. *See id.* at 1019, 38 Cal.Rptr.2d 401. Further, as Judge Newsom points out in his dissent, the majority in *Green* made an erroneous factual determination when it decided enough evidence had been introduced to overcome the presumption of juror misconduct.

### B.

■ We believe, under this court's analysis in *Dyer v. Calderon*, 151 F.3d 970 (9th Cir.1998) (*en banc*), that Adams' pattern of lies, inappropriate behavior, and attempts to cover up his behavior introduced "destructive uncertainties" into the fact-finding process, and, under *Dyer*, we must presume bias under these circumstances.

■ The Sixth Amendment guarantees a criminal defendant a fair trial by a panel of impartial, indifferent jurors. *See Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Actual bias against a defendant on a juror's part is sufficient to taint an entire trial. *See United States v. Allsup*, 566 F.2d 68, 71 (9th Cir.1977). In extraordinary circumstances, "courts may presume bias based on the circumstances." *Dyer*, 151 F.3d at 981. *See also McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556–57, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (Blackmun, Stevens, and O'Connor, JJ., concurring) (accepting that "in exceptional circumstances, that the facts are such that bias is to be inferred"); *id.* at 558, 104 S.Ct. 845 (Brennan and Marshall,

JJ., concurring in the judgment) (agreeing that "[t]he bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law") (alterations in original) (quotations omitted); *United States v. Wood,* 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936); *Smith v. Phillips,* 455 U.S. 209, 221–24, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring); *United States v. Burr,* 25 F.Cas. 49, 50 (D.Va. 1807) ("He may declare that notwithstanding these prejudices he is determined to listen to the evidence, and be governed by it; but the law will not trust him.").

In *Dyer,* an *en banc* panel of this court was faced with a juror whose lies concealed information that would have kept her off the jury.[6] While the panel was unable to find any actual bias on the part of the juror, *see Dyer,* 151 F.3d at 981, this court nevertheless presumed bias on the juror's part, inferring from her pattern of lies a desire to "preserve her status as a juror and to secure the right to pass on Dyer's sentence." *Id.* at 982. While the court was unable to say exactly what motive the juror had to stay on the jury, it believed that, "[t]he individual who lies in order to improve his chances of serving has too much of a stake in the matter to be considered indifferent." *Id.* Thus, in *Dyer*'s crucial passage, this court held that bias should be presumed where a

juror's actions create "destructive uncertainties" about the indifference of a juror:

> A juror ... who lies materially and repeatedly in response to legitimate inquiries about her background introduces destructive uncertainties into the process.... [A] perjured juror is unfit to serve even in the absence of ... vindictive bias. If a juror treats with contempt the court's admonition to answer voir dire questions truthfully, she can be expected to treat her responsibilities as a juror—to listen to the evidence, not to consider extrinsic facts, to follow the judge's instructions—with equal scorn. Moreover, a juror who tells major lies creates a serious conundrum for the fact-finding process. How can someone who herself does not comply with the duty to tell the truth stand in judgment of other people's veracity? Having committed perjury, she may believe that the witnesses also feel no obligation to tell the truth and decide the case based on her prejudices rather than the testimony.

*Id.* at 983.

As this passage indicates, *Dyer* was decided not on the basis of the juror's past history, but on the pattern of lies the juror engaged in to secure her seat on the jury.[7] Given this, Adams' conduct raises serious questions about his ability to impartially serve on a jury. Adams lied twice to get a

---

**6.** Among other things, the juror lied when asked if any close relative had been a victim of a crime. She answered "no," but it later came out that her brother had been murdered. *See Dyer,* 151 F.3d at 972. She explained that she thought that her brother's death had been an accident. The *en banc* panel of this court found that explanation to be incredulous: her brother had been pistol whipped four times and shot in the back of the neck.

**7.** The district court's opinion dismissing Green's habeas petition failed to understand this part of *Dyer*'s holding. The *Dyer* court did not presume bias because of the juror's past history; in fact the court very clearly indicated that it did not know whether her past history made her biased. *See Dyer,* 151 F.3d at 981 ("It's certainly possible that anger

about her brother's killing drove [the juror] to finagle a seat on the jury so she could lobby for a conviction and death sentence.... On the other hand, the fact that many of her relatives had been arrested suggests she could have harbored some empathy for criminal defendants. However, we need not resolve the actual bias question ... because the implied bias question is dispositive here."). As the language from *Dyer* quoted in the text *supra* indicates, it wasn't the juror's history, but the *lies* about the history that created "destructive uncertainties" about the fact-finding process. *Cf. United States v. Boney,* 977 F.2d 624, 634 (D.C.Cir.1992) ("Lying about a factor as important ... as felon status raises at least the inference that the juror had an undue desire to participate in a specific case, perhaps because of partiality.").

seat on the jury; when asked about these lies, he provided misleading, contradictory, and outright false answers.[8] In addition to these lies, he engaged in behavior that brings his impartiality into serious question, and provides strong circumstantial evidence of his motive for lying: his stated desire to get a gun and kill Green himself; his statement that he knew Green was guilty from the moment he saw him;[9] his statement to a friend that the wrong people receive too many rights; and his past "investigation" activities, which, of course, he boasted about to the jury. All of these facts, considered as a whole,[10] create "destructive uncertainties" regarding Adams' ability to render a fair verdict.

For these reasons, we believe that the determination of the California Court of Appeals that Adams was not a biased juror is not supported by the evidence.

### Conclusion

The state trial court as well as the California Appeals Court found that Adams did not lie about his past criminal history. Based upon this determination, both courts found that Adams was not biased. For the reasons stated above, we hold that these factual determinations were clearly erroneous. It is clear that Adams' pattern of lies and misbehavior has created "destructive uncertainties" about his ability to serve as an impartial juror. *Id.* We therefore REVERSE the district court's denial of Green's petition for a writ of habeas corpus and we REMAND to the district court with instructions to grant a writ of habeas corpus for Green unless the state court grants Green a new trial within a reasonable time.

### REVERSED and REMANDED.

**8.** In addition to the discussion of Adams' misleading statements regarding who filled out the jury questionnaire form, note this following statement juror Adams provided in his supplemental declaration filed for the state:

> I did not find out about any alleged threat to Cheryl Jones until after the jury deliberations began. In my supplemental affidavit, # 3 begins "... two or three days into the trial." I meant two or three days after we had assembled to reach a verdict. From what I heard, the pointing happened "... well before the case went to the jury ...", but I didn't know about it or have any discussion about it until after our deliberations began.

ER at 82.

Compare this with his statement in the affidavit he refers to:

> Two or three days into the trial, I was informed by jurors Cheryl Jones and Ken Alley, ... that a young black woman sitting in the audience had pointed her finger at Cheryl Jones.... While I did not see this happen, at that time and *well before the case was sent to the jury,* we all discussed this event.

*Id.* at 48–49 (emphasis added).

**9.** The state court's treatment of this issue is particularly disturbing. Adams claimed that he (1) didn't make the statement, (2) didn't remember making the statement, and (3) if he did make that statement, he meant only "to express how strongly I believed he was guilty." Later, as discussed *supra,* he admitted to making the statement. The appellate court, as discussed *supra,* finessed the statement, stating, "the statement could be interpreted as merely post-hoc boastfulness ('I knew it all the time.'). The trial court was entitled to assess the credibility of [Adams]." With all due respect, this doesn't make sense. How can the statement "I knew it all the time" mean anything other than "I knew it all the time." We need not take such a statement absolutely literally; a juror who says "I knew he was guilty from the start" doesn't necessarily mean that he formed a rock solid opinion from the first moment he saw the defendant. But even when we consider boastfulness, such a statement still *necessarily* implies the juror had a feeling—a bias—against the defendant before the evidence was presented.

**10.** We note that none of the reviewing courts (except Judge Newsom's dissent) looked at all of the facts as a whole. Both the trial court and California Court of Appeals analyzed each incident separately, and any one of these incidences might be harmless in isolation. But when Adams' behavior is viewed as a whole, a much more sinister picture appears.