Filed 4/29/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NISSAN MOTOR ACCEPTANCE CASES. | G055748 |
| NISSAN MOTOR ACCEPTANCE CORPORATION, <br><br>     Plaintiff, Cross-defendant and Appellant, <br><br>           v. <br><br> SUPERIOR AUTOMOTIVE GROUP, LLC, et al., <br><br>     Defendants, Cross-complainants and Appellants. | (JCCP No. 4613 <br> Super. Ct. No. 30-2009-00305125) <br><br> O P I N I O N |

Appeal from posttrial orders of the Superior Court of Orange County, Thierry Patrick Colaw, Judge.  Affirmed.

Rutan & Tucker, Richard K. Howell and Gerard M. Mooney; Miller Barondess, Louise R. Miller, Amnon Z. Siegel and J. Mira Hashmal for Defendants, Cross-complainants and Appellants.

Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Bradley J. Hamburger; Severson & Werson, Jan T. Chilton and Mark Joseph Kenney for Plaintiff, Cross-defendant and Respondent.

*       *       *       *

This case is a commercial lending dispute. Plaintiff, cross-defendant and appellant Nissan Motor Acceptance Corporation (NMAC) is a subsidiary of nonparty Nissan Motors of North America. NMAC is a specialty lender that loaned money to Nissan automobile dealers.

Defendants, cross-complainants and appellants, Michael A. Kahn (Kahn) and his wife Tami L. Kahn, plus a group of now defunct limited liability company auto dealerships they owned, were NMAC borrowers. These entities and individuals refer to themselves collectively as "Superior" and we will do the same.

This appeal and cross-appeal arise out of the retrial of Superior's cross-claims against NMAC. The jury awarded Superior $256.45 million in compensatory and punitive damages based on two promissory fraud theories—negligent misrepresentation and fraudulent concealment. The trial court granted NMAC's motion for new trial based on juror misconduct, but denied NMAC's motion for judgment notwithstanding the verdict (JNOV).

Superior contends NMAC forfeited its right to complain about juror misconduct. It also challenges the sufficiency of the evidence to support the trial court's discretionary decision to grant NMAC's new trial motion. We conclude NMAC did not forfeit the basis for its new trial motion and substantial evidence supported the court's juror misconduct findings. Contrary to Superior's claim, we perceive nothing arbitrary or capricious in its prejudice ruling. We affirm the new trial order.

2

In the cross-appeal, we conclude substantial evidence supported the trial court's denial of NMAC's motion for JNOV. Consequently, we affirm the trial court's order granting a new trial and its order denying NMAC's JNOV motion.

I

FACTS AND PROCEDURAL HISTORY

*The Basic Dispute*

In 2008 Superior owned and operated seven dealerships, including four Nissan stores. NMAC provided financing for six of the seven Superior dealerships. Because independent automobile dealers, like Kahn, generally do not pay cash for the vehicles on their lots, they often borrow the money, from the financing arm of the auto maker whose cars they sell, and use those cars as collateral for the loan. (E.g., *Elfman Motors, Inc. v. Chrysler Corp.* (E.D.Pa. 1977) [1977 US Dist. LEXIS 14564].) In the industry, this practice is known as "floorplan lending." (E.g., *GMAC, LLC v. Hiatt Pontiac GMC Trucks, Inc.* (W.D.Wash. 2009) [2009 US Dist. LEXIS 113456].)

The standard floorplan lending agreement requires the auto dealer to pay back a pro rata portion of the loan within a certain period after each individual vehicle is sold and driven off the dealer's lot. If a dealer fails to pay within the agreed time after a vehicle is sold, the dealer is "SOT," which stands for "sale out of trust." In other words, the dealer has violated the lender's trust by converting a loan secured by the right to repossess the unsold vehicles into an unsecured loan.

The floorplan lending agreement between NMAC and Superior had a "2- day/10-day" rule. Superior was obligated to pay NMAC within two days after it received payment for the car, or within 10 days after the sale, regardless of whether the dealer had received payment.

According to Kahn, NMAC did not strictly enforce the 2-day/10-day rule. Instead, NMAC tolerated late payments up to 25 percent of Superior's vehicle sales. This posed no difficulty since Superior was profitable.

3

Prosperity came to a grinding halt during the severe economic recession of 2008.  By June 2, Superior's accumulated SOT with NMAC was around $1.36 million.  During the summer Superior's vehicle sales dropped 40 percent from prerecession levels.  By October 10 Superior's accumulated SOT—the amount of money Superior owed NMAC—had grown to $4.5 million.

At that point Kahn and NMAC's president, Steve Lambert, had several conversations which form the heart of this dispute.  According to Kahn, in early October 2008 Lambert expressly approved Superior's continued accumulation of floorplan inventory SOT debt to help Kahn's dealerships survive the recession.[1]

After several conversations, Kahn and Lambert struck the following oral agreement:  In return for Kahn selling his dealership in San Juan Capistrano—even if he incurred a big loss—NMAC would continue financing Superior at least through the end of 2009.[2]

---

[1]  Kahn testified:  "So I said to him [Lambert]—I said I need to get cash quickly so that we don't have a problem.  And I said why don't you just let me operate out of trust, and as I sell off the cars I'll gather up some cash, and in short order we'll be in good shape.  And he said Mike I can't knowingly just let you operate out of trust.  You know, we're a public company, we're a finance company, we can't let you operate out of trust.  And I said it's the quickest way to do it.  *He said, all right, do what you got to do.  And I'll look the other way.*"  (Italics added.)

[2]  Specifically, Kahn testified:  "And I said, well, Steve, if I'm going to sell that dealership in this market we're now into October of 2008.  Truly the worst time ever in my lifetime by far, I think everybody's, and I said I'm going to lose a great deal of money if I sell this dealership.  [¶] And he in turn said, Mike, this is what we need to do.  We've got to sell that property, pay us down debt, and then that gives us an opportunity to loan you back money to get you through the storm.  [¶] And we went back and forth for quite awhile on the phone and the end result is that at the end of the conservation he said this is the deal:  *You sell San Juan and I will get you through '09.*"  (Italics added.)

4

On November 4, 2008, Superior and NMAC entered into a forbearance agreement superseding NMAC's earlier forbearance agreements. The agreement included a $7.7 million loan to Superior to satisfy its existing SOT debt and Kahn's agreement to secure the loan with deeds of trust on some of his real property. The agreement also included a $4 million loan so Kahn could finish building a new Oakland dealership.

According to Kahn, four days before the forbearance agreement was signed, NMAC's director of credit services, Kevin Cullum, called Kahn to go over the agreement's "bullet points" and advised NMAC would loan $6.6 million. Kahn testified that when he protested the amount was less than what Lambert had agreed to, Cullum replied Superior could take the offer "or [Cullum would] just come, shutdown [Superior,] and pick up all the cars." Again according to Kahn, three days later on November 3, the day before the forbearance agreement was signed, Lambert called Kahn and gave him the following assurance: "Mike, nobody is shutting you down. Relax. Don't worry about it. Put it behind you."

During the same general time period—i.e., leading up to the signing of the November forbearance agreement—Lambert sent an internal e-mail to NMAC executives incorporating his e-mail conversation with Superior's president of real estate companies concerning "open questions" about Superior and NMAC's relationship after the sale of Superior's San Juan Capistrano dealership. The executives shared their viewpoints with

---

Elaborating, Kahn testified: "And I said, Steve, if I got to cut my pinkie off to save my arm I'm going to lose $10 million making this deal. I said I'll do it if I know I have your support 100 [percent]. He said you sell that dealership with one condition: I want it sold by the end of the year. It's got to be sold by December 31, 2008, and you got my support. I will get you through '09. And then he asked me what he thought – what I thought it was going to take to get through '09. And I said, worse case scenario could be 12 to $15 million. Who knows at this point because the economy is going crazy and things are changing daily. *And he said you're probably right. Sounds like the right number. And that was the deal.*" (Italics added.)

5

Lambert, including Cullum's "recommend[ation] that [NMAC] move towards a complete separation [from Superior]."  In the other e-mail conversation, Lambert asked for information about different possible scenarios, "to go over how to proceed with Kahn/Superior."

According to Kahn, on January 5, 2009, Lambert asked for a projection of Superior's revenue and losses in the next six months.  Kahn testified Lambert said, "Get me the pro forma, we'll get everything documented, and we'll get you the money, and we'll be in good shape."  In sum, Kahn testified he relied on the following representations:  Lambert's assurance in early October 2008 that NMAC would "look the other way" on SOT's to help Superior stay in business; Lambert's assurance in late October 2008 he would "get" Superior "through" 2009 if Kahn sold his San Juan Capistrano dealership by the end of December 2008; Lambert's assurance on November 3 that "nobody is shutting you down," and Lambert's assurance on January 5, 2009 that NMAC would "get" Superior "the money" if Kahn got the pro forma to NMAC.

Kahn claimed he fulfilled Superior's side of the bargain.  He sold his San Juan Capistrano dealership on December 18, 2008, though it meant a $10 million personal loss.  And in early 2009, he took other steps on the assumption he would continue to receive financing, including using his home and other assets as collateral in giving NMAC a personal guarantee on February 9 to cover Superior's debts.  But according to Kahn, NMAC did not keep its promise to continue financing Superior through 2009; rather, it cut off Superior's floorplan lending on February 11, 2009, two days after receiving Kahn's guarantee.

Lambert's version of the understanding between him and Kahn was more conditional.  Lambert testified he agreed to finance Superior "through 2009," but *only* on the condition that Superior "not go SOT."  And he "never said" he would "look the other way" if Superior "sold cars out of trust."  In fact, Lambert testified he specifically told Kahn that Superior *could not* sell cars out of trust.

6

As the recession deepened in early 2009, NMAC grew concerned about Kahn's prospects. On January 16, 2009, Kahn signed an extension of the November forbearance agreement which continued forbearance on existing floorplan loans to the end of March 2009. When the parties signed the agreement Superior had an SOT of $1.5 million. A cover letter to the extension advised Superior there would be "no further tolerance for non-payment of sold units due [i.e., SOT sales]."

Kahn signed the extension agreement and over the next few weeks provided more collateral security to NMAC while Superior finished construction of the Oakland dealership. Then on February 11, NMAC sent Kahn a notice of default, demanding payment in full within 24 hours. Two days later NMAC foreclosed on Superior's assets, which included Kahn's personal residences and the newly finished Oakland dealership. Superior's dealerships stopped doing business.

*The First Trial and First Appeal*

After NMAC declared the default Superior still owed NMAC money. NMAC sued Superior for breach of contract on the various debts Superior owed it. Superior cross-complained for breach of contract and three forms of fraud, including negligent misrepresentation and fraudulent concealment. After an eight-day jury trial, the court granted NMAC's nonsuit motion on all of Superior's promissory fraud cross-claims.

The trial court granted nonsuit based on Kahn's breach of the written agreements. There was nothing in those written agreements to support Kahn's claim NMAC orally promised to keep lending Superior money through 2009. Only parol evidence of Kahn's conversations with Lambert supported Superior's promissory fraud claims. In granting nonsuit, the court relied on *Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258 (*Pendergrass*), which held a party may offer parol evidence to prove fraud only if the evidence shows an independent fact or representation that does not directly contradict the terms of the written contract. (*Id*. at p. 263.) The

7

jury, left with only the competing contract claims to consider, awarded about $40 million to NMAC, and nothing to Superior.

Superior appealed. While its appeal was pending the California Supreme Court decided *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169 (*Riverisland*), which squarely overruled *Pendergrass*. This court then held *Riverisland* applied retroactively (*Nissan Motor Acceptance Corporation* (Jan. 16, 2014, G046914) [nonpub. opn.] (NMAC I)), thus resurrecting Superior's promissory fraud claims. Superior did *not* appeal from NMAC's $40 million victory on its breach of contract claims, meaning the retrial was limited to the promissory fraud claims alleged in Superior's cross-complaint. As a result, Superior became the de facto plaintiff in the second trial.

*The Second Trial*

*The Jury Questionnaire and Juror Woodside's Answers*

During jury selection, the parties used a 17-page questionnaire that contained 56 questions, five of which are central to this appeal:

Question No. 19: Have you, any members of your family, or close friends ever filed a lawsuit against anyone?"

Question No. 20: "Have you, any members of your family, or close friends ever been sued?"

Question No. 24: "Have you, a family member, or someone close to you had any SIGNIFICANT **training**, **education** or **work experience** in any of the following areas?" Then, under question No. 24, ten categories were listed: "Accounting," "Automotive Finance," "Automobile Industry," "Banking/Lending," "Business Management," "Car Dealerships," "Economics," "Law," "Real Estate Investment," and "Sales." And to the right of each category there were three boxes, where the prospective juror could check "Yes, self," or "Yes, family" or finally "Yes, someone close."

8

Question No. 43: "Have you ever been accused of breaching a contract or failing to honor a commitment you made in a business or other deal?"

Question No. 49: "If there is any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror?"

The answers of one prospective juror, Angela Woodside Beckstrom (Woodside), became the focal point of NMAC's new trial motion. Woodside answered "no" to all the questions except question No. 24.

On question No. 24 Woodside checked, "Yes, self" for sales, "Yes, family" for automobile industry, and "Yes, someone close" for business management. Responding to the request to "please explain" any yes answers, Woodside wrote: "Auto industry = step son works in industry management = husband worked in management sales = have received sales training in different jobs over lifetime." Woodside did not check any of the boxes to the right of "Car Dealerships."

During voir dire, Superior's counsel questioned Woodside about her stepson's "auto sales" experience and what the job entailed. Woodside stated her stepson was employed by an "auction" company that sold cars wholesale to dealers. NMAC's counsel did not question Woodside on voir dire and Woodside was seated on the jury.

*The Timing Belt Question*

On April 3, 2017, before opening statements, the trial court admonished the jury not to do any outside research and to base their verdict only on the evidence presented during the trial. The court also told them not to form an opinion about the case until it was submitted to them.

The trial court instructed the jurors: "If during the trial you have a question that you believe should be asked of a witness, you may write out the question and send it to me through my courtroom staff. I will share your question with the attorneys and decide whether it may be asked. [¶] Do not feel disappointed if your question is not asked. Your question may not be asked for a variety of reasons. . . . Because the

9

decision whether to allow a question is mine alone, do not hold it against any of the attorneys or their clients if your question is not asked." The court added, "Your question should be posed in as neutral a fashion as possible."

The next day, Kahn took the stand and explained how he built a chain of dealerships, and how he and NMAC had a mutually prosperous relationship until 2008. He recounted the difficulties he encountered during the 2008 recession and Lambert's oral promises made on NMAC's behalf to look the other way on his SOT's and otherwise finance him through 2009.

Shortly after Kahn's afternoon testimony started, Woodside submitted a three-page list of 14 handwritten questions. One question raised a matter Kahn had not discussed in his first day of testimony—defective timing belts: "From 2006-2008 Nissan withheld defaulty [*sic*] timing belts manufactured on 6 different models – did they disclose this potential liabi[lity] that they put Mr. Kahn in?"

That afternoon, after the jury went home, NMAC's counsel moved to excuse Woodside, asserting she was either "dishonest with us in voir dire or has been doing some research since this case began." Superior's counsel argued she probably had known about the timing belts from some news article, but observed, "God knows where she got this information from."

The trial court addressed the issue during the morning recess the next day. The court voiced its concern about the timing belt question, which, the court observed, created, "a little tiny mouse of doubt" about "where that came [from]. . . ." The court also noted it "never had a juror ask so many questions that are so pointed and so pertinent." At the lunch recess, the court excused the jury but asked Woodside to remain.

The trial court asked Woodside directly where she got the information posed in her question about timing belts. She responded she picked up the information in

10

family gatherings with her brother and father, all of whom are car enthusiasts.[3] She added that she personally was loyal to Mercedes as a brand and she would never buy a Nissan.

The conversation ended with the trial court asking, "And you can assure me that you [won't] use the Internet or talk to your brother or, I guess, son-in-law, about cars or about this case at all?" Woodside responded, "No, no, no. I'm looking forward to when this is over."

After Woodside left for lunch, the trial court asked the attorneys, "[d]o you want me to excuse her?" NMAC's counsel said he'd "like to think about that," while Superior's counsel said: "Obviously not, your Honor. There's no reason to excuse her."

*The Formal Motion to Excuse Woodside*

During the next three weeks Woodside continued to submit more questions. Several questions focused on the theme of predatory lending, insinuating NMAC could be held responsible for lending Superior too much money. For example, on April 11 she asked: "Regardless of dealer/owner willingness, wouldn't NMAC have to carefully assess a 'tipping point' of overlending to any one dealer group and own . . . partial responsibility of [sic] inevitable financial hardships on an over-lended owner." She also asked "What is [NMAC] procedure for restoring stability to dealer/owners that NMAC 'over lends' to?"

On April 26, NMAC filed a formal written motion to excuse Woodside or designate her as an alternate. NMAC based its motion solely on the tenor of the questions Woodside had submitted during the trial. Taking up the motion, the trial court

---

[3] The following is Woodside's response to the trial court's question: "So I have three older brothers. I'm the only girl. So being raised in a house where my dad would rebuild dune buggy engines and my oldest brother has worked in the auto shops, he's now a mechanic instructor at UTI, and so whenever we have family gatherings . . . . [¶] The court: Cars? [¶] [Woodside]: Yeah. And my stepson is involved with cars, so, you know, it's in the topic of conversation."

11

began by noting, "I never had that many questions from one juror," and observed "[NMAC's] brief raises an issue that worries me." But after reviewing Woodside's answers to the questionnaire, the court concluded her answers were "innocuous" and denied the motion, although it acknowledged the denial may result in a new trial motion.

*The Jury Deliberations and the Verdict*

On May 2, 2017, the jury began their deliberations. On May 8, after lengthy and apparently difficult deliberations, the jury reported it was deadlocked. But deliberations continued, and on May 10, the foreperson notified the trial court the jury had reached a 9-3 verdict on Superior's fraudulent concealment claim.

Deliberations continued over the following week. On May 16, the foreperson sent a six-page letter to the court expressing several concerns. Item No. 7 stated, "One juror did research on the case at home and argued facts not in evidence during deliberations." But after a jury vote, item No. 7 was crossed out of the letter. The juror in question was Woodside.

The trial court again interviewed Woodside outside the presence of the other jurors, and asked her whether she had done outside research. Woodside denied having done so, stating "No, I did not."

Concerning the foreperson's six-page letter, Woodside described how she reacted indignantly at the notion she had done outside research: "I said . . . are you insinuating I researched at home? And he said, well, you brought information in here. How would you know that? And I said my brother teaches at UTI engine repair at a college, he's done this his whole life, he's 58, my family grew up talking about cars, this information was just in lifestyle, and I resent you making the assumption that I searched at home on the Internet." After Woodside's explanation, the trial court allowed the jury to continue deliberating.

On May 17, 2017, the jury found NMAC liable on two of Superior's promissory fraud theories, negligent misrepresentation and fraudulent concealment, and

12

awarded Superior $121.9 million in compensatory damages. The jury found in favor of NMAC on a third theory, false promise fraud, and specifically found it intended to perform its promise.

On May 22, 2017, there was a short punitive damages trial. That afternoon the jury returned a punitive damages verdict for $134.55 million, bringing the total award to $256.45 million.

*The New Trial Motion*

On September 8, 2017, NMAC filed a motion for new trial. Two issues emerged: Whether Woodside committed misconduct by conducting outside research during the trial and jury deliberations, and whether she gave untruthful answers on the jury questionnaire.

*Woodside's Outside Research*

NMAC supported its new trial motion with declarations from three of the jurors, Juror Nos. 3, 6, and 1. Juror No. 3 recounted that while the jury discussed damages, Woodside "said that there were several large recalls of Nissan vehicles around the time the Superior dealerships closed." Woodside claimed "the Superior Oakland dealership had many more service bays than a normal dealership and this recall work would give [Kahn] a lot of extra income." Juror No. 3 further noted a "few" jurors "responded . . . [by] "saying it was improper to raise things which were not in evidence."

Juror No. 6 also said Woodside brought up the subject of "several large recalls of Nissan vehicles around the time the Superior dealerships closed" and the extra income the Oakland dealership would receive from its "numerous service bays."

Juror No. 6 described how Woodside responded when confronted about discussing information that was not in evidence. According to Juror No. 6, Woodside replied: "'I discussed this with the Judge,'" and then she added, "'[w]e have to consider it.'" While Juror No. 6 made it "clear that [Woodside] did not say the Judge had said you must consider it,'" the "way she put those sentences made it seem that way."

13

Juror No. 1, the foreperson, corroborated Juror Nos. 3 and 6's statements that Woodside raised the subject of the large number of recalls around the time the dealerships closed, and the Oakland dealership's large number of service bays, which Woodside claimed refuted a NMAC expert's cash flow projections in computing damages.

Further corroborating Juror No. 6, Juror No. 1 also noted Woodside responded, "I think we have to consider it" when told it was improper to look at outside information.

*Woodside's Answers to the Jury Questionnaire*

NMAC's new trial motion argued that Woodside provided untruthful answers to the jury questionnaire. Although Woodside claimed she had never been sued, NMAC presented evidence she had been sued several times in both civil actions and unlawful detainers. Woodside also stated her stepson had worked in the "auto industry," but it turned out he had worked in an Ontario car dealership (CNC Motors) from 2012 to 2014, and beyond that had owned a wholesale car dealership business. The evidence also showed her daughter-in-law had worked in that same car dealership for a few years. That dealership, CNC Motors, advertised itself as a "family owned and operated pre-owned exotic car dealership."

Superior's opposition to the new trial motion argued NMAC's claim Woodside had done Internet research during the case was mere speculation, and Woodside's reference to recalls was a brief comment made during the deliberations on damages. Superior also contested NMAC's claim Woodside deliberately falsified her answers on the questionnaire. Superior noted all the lawsuits were 20 to 30 years old, none more recent than 17 years, and Woodside simply did not remember these older cases. Woodside did not believe her son-in-law's employer was a car dealership, like the franchised dealerships Kahn owned, and her daughter-in-law's employment at CNC Motors was only "brief."

14

Superior supported its opposition with 10 juror declarations.[4] The declarations were not identical, but several themes emerged: Woodside did not say "we have to consider" recalls. Any "recall" comment Woodside made was during consideration of the lost revenue Superior sustained from the closure of Kahn's Oakland Toyota dealership with its large number of service bays.[5] Woodside never talked about any Nissan recalls.

NMAC submitted five declarations in response to Superior's opposition. Two of those reply declarations touched on rules of professional conduct: May trial counsel treat discharged members of a jury to a postverdict dinner after they have returned a favorable verdict for the attorney's client? These declarations were from two private investigators who observed and videotaped Superior's team of lawyers entertaining a group of jurors at an upscale restaurant on May 24, 2017, just two days after the punitive damages phase of the trial concluded.

Superior's trial counsel addressed the issue concerning dinner with the jurors at the October 13, 2017 hearing on the new trial motion. He acknowledged six jurors showed up for the dinner, and explained it was planned after the compensatory damage award but before the punitive damage award. The invitations already were printed, and the jurors received the invitations the same day they returned the punitive damages verdict to "thank" them for their "jury service."[6] Superior's lead trial counsel

---

[4] Juror No. 3 gave declarations for both sides.

[5] There was undisputed testimony that an auto dealer makes money on a recall by billing the auto maker.

[6] Trial counsel offered the following explanation: "First of all, I've done dinners with jurors on a number of cases we won. Okay. This dinner was planned, and we had invitations printed out before we even had the punies argument, thinking maybe, if the jury comes back today, we'll give them the invitation, because the dinner is going to be in a few days. It's to thank them for their jury service. Absolutely."

15

never addressed NMAC's counsel argument that a juror's service continues until the new trial motion.

The trial court, however, focused on Woodside's timing belt question and her answers on the juror questionnaire. After taking the motion under submission, the court granted a new trial motion.[7]

The trial court first noted two falsehoods in Woodside's answers to the voir dire questionnaire: (1) Woodside failed to tell the court "she had been personally sued multiple times in civil actions," in "several unlawful detainer actions" and also had been an officer, director, and agent for service of process of corporations sued by the state of Florida for securities violations; and (2) Woodside failed to disclose her stepson had "worked for several years at a car dealership" and "also owned at one time a wholesale

---

[7] The trial court did not rely on or reference Superior's postverdict dinner with the jurors. But that dinner could have furnished a sound basis for granting a new trial if the court determined it prejudicially impacted NMAC's efforts to show it was entitled to a new trial.

Jury service doesn't end with a verdict. There is always the possibility of a new trial motion based on alleged juror misconduct, in which discharged jurors could be percipient witnesses to the alleged misconduct. (See *Lind v. Medevac, Inc.* (1990) 219 Cal.App.3d 516 (*Lind*).) Since jury declarations are the obvious and, in many cases, the only source of information about juror misconduct that might warrant a new trial, their "service" extends to the time they might be asked to give declarations on the topic. (*Id*. at pp. 520-521.)

Although Superior's trial counsel claimed there was nothing wrong with the juror dinner, rule 3.5, subdivisions (g) and (h) of the Rules of Professional Conduct (former rule 5-320 at the time of the dinner, and before that former rule 7-106), forbids attorneys from attempting to influence jurors regarding their "present or future jury service," even after those jurors have been discharged.

In *Lind*, jurors received a letter from the winning attorney warning that "a fellow member of the bar might employ 'sharp investigative tactics' to 'impeach' the jury's verdict and have it set aside as 'improper.'" The appellate court held that counsel's letter violated former rule 7-106. (*Lind, supra*, 219 Cal.App.3d at p. 521.) A postverdict dinner at an upscale restaurant poses a similar if not more substantial risk of influencing jurors to favor counsel and his client at a new trial motion.

We note none of Superior's appellate attorneys from the Rutan firm participated in the juror dinner.

16

car dealership business" while her daughter-in-law "since 2012 worked for an exotic car dealership in Ontario, California."

The trial court also focused on Woodside's timing belt question on the first day of trial. The court noted there had been no evidence presented about a timing belt issue. "While the other questions at that time seemed to show that [Woodside] was perhaps just thinking about the issues, in hindsight, it is very clear to this judge that she had information from some source that was outside the evidence."

As to prejudice, the trial court noted the nine to three vote on liability, and citing *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110 (*Weathers*), the court concluded the following: "When the verdict is that close, the serious misconduct of a single juror, even conduct that did not influence the other jurors, is usually deemed prejudicial because a different verdict may have been rendered without the misconduct."

## SUPERIOR'S APPEAL FROM THE NEW TRIAL ORDER

NMAC's new trial motion alleged juror Woodside concealed her bias toward NMAC by providing false or misleading answers on the juror questionnaire. NMAC claimed it learned of Woodside's misconduct only after its postverdict investigation uncovered Woodside's alleged duplicity.

Superior disputes NMAC's claim it was unaware of Woodside's misconduct.[8] In arguing NMAC waived or forfeited the right to a new trial based on Woodside's misconduct, Superior relies on the well-settled rule that a party aware of jury misconduct during trial but waits to object until after the jury's verdict cannot later raise the issue in a new trial motion. (*Weathers, supra*, 5 Cal.3d at p. 103.) Superior argues NMAC "indisputably knew or should have known several weeks *before the verdict* many

---

[8] NMAC argues Superior itself has forfeited its waiver arguments by failing to provide us with a transcript of the voir dire proceedings. We need not address NMAC's waiver argument because we reject Superior's forfeiture arguments on the merits.

17

of the facts supposedly constituting Woodside's 'misconduct,' but failed to explore those matters in *voir dire* or raise them before filing its New Trial Motion."

The trial court implicitly rejected Superior's forfeiture arguments when it granted a new trial. We review orders granting a new trial for abuse of discretion. (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 859.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377; *People v. Jordan* (1986) 42 Cal.3d 308, 316 [abuse of discretion occurs when a court makes a decision in an "arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice"].) We must consider the legal principles and policies governing the court's discretion in evaluating whether the court stepped outside the scope of its discretion. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) But we may overturn the new trial order only if a manifest and unmistakable abuse of discretion occurs. (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [appellate court will not set aside new trial order "[s]o long as a reasonable or even fairly debatable justification under the law" is shown].)

In turning aside Superior's forfeiture argument, the trial court necessarily had to resolve several factual disputes concerning when NMAC knew Woodside may have committed misconduct. "'Even under [the abuse of discretion] standard, there is still a substantial evidence component. We defer to the trial court's factual findings so long as they are supported by substantial evidence, and determine whether, under those facts, the court abused its discretion.'" (*McDermott Will & Emory LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1121.) Substantial evidence is defined as evidence that is reasonable, credible, and of solid value. (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) In evaluating the evidence, we must draw all inferences in favor of the prevailing party and accept the trial court's resolution of conflicts in the evidence. (*Clark v. Superior Court* (2011) 196 Cal.App.4th 37, 46-47.)

18

In *Weathers*, the California Supreme Court held that an attorney forfeits the right to seek a new trial based on juror misconduct if the lawyer knew of the misconduct but did not raise the issue until after the jury's verdict. (*Weathers, supra*, 5 Cal.3d at p. 103.) The court explained the rule's purpose is to prevent a party or its attorney "from gambling on the outcome of the jury's deliberations while secretly preserving the error" for a new trial motion if the jury returns an unfavorable verdict. (*Ibid*.) Consequently, trial courts require a "'no knowledge'" declaration from the moving party in a new trial motion based on juror misconduct. (*Ibid*.)

Here, NMAC's defense team met this requirement when they filed declarations stating neither NMAC nor its lawyers knew before the verdict Woodside's answers to the questionnaire were false or misleading. The key declaration summarized the extent of their knowledge: they knew (1) she filed bankruptcy in 1998; (2) her answers to the questionnaire; (3) her questions during trial; (4) her answers in open court; (5) the contents of the jury foreperson's letter during deliberations; and (6) all the facts stated in NMAC's formal motion to discharge her brought before the case was submitted to the jury. These declarations showed NMAC's attorneys did not know Woodside's answers were false or misleading until they uncovered evidence of her malfeasance in their postverdict investigation. The trial court implicitly found these declarations credible because it rejected Superior's forfeiture arguments when it granted NMAC a new trial. Normally, this would end our analysis because we may not second-guess the trial court's credibility determinations. (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 795 ["out of the question" to disturb trial court's resolution of factual issues].)

Superior, however, contends the trial court abused its discretion in rejecting its argument NMAC forfeited its juror misconduct claim because the evidence as a matter of law does not support the court's conclusion. (See *People v. Cluff* (2001) 87 Cal.App.4th 991, 998 ["A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence"].) Specifically Superior asserts the

19

evidence supports only the following conclusion: (1) NMAC knew or should have suspected Woodside committed misconduct but forfeited the issue because it did not object until after the verdict; and (2) NMAC's failure to immediately ask the court to excuse Woodside when she submitted her timing belt question forfeited NMAC's right to complain she obtained information from outside sources. We address each issue in turn.

*Question No. 24*

NMAC's new trial motion claimed Woodside falsely answered "No" to question No. 24 on the questionnaire, which asked whether the prospective juror, a family member, or close friend had significant training, education, or work experience in several fields, including the automotive industry, car dealerships, management, and sales. As noted, Woodside's expanded answer stated her stepson worked in the auto industry, her husband worked in management, and she "received sales training in different jobs over lifetime." In an earlier answer to question No. 15, Woodside stated her stepson worked in "auto sales," and his spouse was a "homemaker." NMAC's new trial motion presented evidence Woodside's brother worked in car repair shops and was a "UTI engine instructor at college"; Woodside had significant informal training and experience in the automobile industry; and her stepson worked in sales at a car dealership and previously owned and managed a wholesale car dealership.

Superior contends NMAC forfeited the right to complain about these apparent nondisclosures. As to Woodside's failure to disclose her brother worked in automobile repair shops and taught students about car engines in a trade college class, Superior argues NMAC knew about Woodside's misconduct when she revealed this information in open court when questioned about her timing belt inquiry on the second day of trial. Superior also argues Woodside disclosed her knowledge about cars when answering the trial court's inquiry about her timing belt question, explaining her family

20

often discussed cars during family gatherings.[9] According to Superior, Woodside's disclosures in explaining her timing belt question shows NMAC was aware of any purported concealment.

Woodside's explanation about her timing belt question suggested her answer to question No. 24 was incomplete. NMAC argues Woodside's disclosures in open court meant NMAC did not keep this information hidden while gambling on a favorable verdict and revealing it only later in a new trial motion. (*People v. Adame* (1973) 36 Cal.App.3d 402, 410 ["'no knowledge'" rule inapplicable when both court and counsel learn the basis for a new trial motion].) Superior correctly points out, however, a party cannot "simply sit" on information showing juror misconduct, even if the information is disclosed to the trial court. Thus, Superior concludes Woodside's disclosures on the second day of trial supports only one conclusion as a matter of law: NMAC knew Woodside committed misconduct because she did not reveal this information on the juror questionnaire and therefore NMAC forfeited the right to rely on this evidence in a new trial motion when it failed to raise the issue during trial.

This is not the only conclusion the trial court could draw from the evidence, however. An inadvertent or unintentional nondisclosure does not necessarily reveal a juror's prejudicial bias. (*In re Manriquez* (2018) 5 Cal.5th 785, 796-797 [juror's unintentional nondisclosure caused by an honest mistake during voir dire provides no basis to overturn the judgment unless evidence shows the incomplete answer hid juror's bias].) At this point in the trial NMAC could have assumed Woodside's nondisclosures in answering question No. 24 were unintentional, especially since she voluntarily disclosed the information when explaining the basis for her timing belt question. No evidence shows NMAC's attorneys suspected Woodside provided false or misleading

---

[9] After hearing Woodside's explanation, the trial court described her as a "Marisa Tomei," the actress in the movie, "My Cousin Vinny." Tomei played a character who qualified as an expert witness on cars.

21

answers to question No. 24 or to the other questions on the questionnaire. But even if NMAC suspected Woodside deliberately provided false answers to the questionnaire, a suspicion is not equivalent to having knowledge a juror committed misconduct. Moreover, suspicion is an insufficient basis to challenge a sitting juror. This requires evidence the juror held a fixed bias under the demonstrable reality test, which is "more comprehensive and less deferential" than the substantial evidence standard. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052-1053; *Shanks v. Department of Transportation* (2017) 9 Cal.App.5th 543, 550 [demonstrable reality test requires "a higher level of scrutiny" than the typical substantial evidence review].) Without evidence to meet this more stringent standard, NMAC had no obligation to lodge a formal objection when doing so would be futile. (*Id*. at p. 551.) Under these circumstances, the court reasonably could find NMAC's "'no knowledge'" declaration credible.

As to Woodside's failure to disclose her stepson owned a car dealership and worked for another dealer, Superior constructs a connect the dots argument to impute knowledge of her concealment to NMAC. Superior notes Woodside disclosed her stepson worked in "auto sales" when answering question No. 15, and that he had significant training, education, and work experience in the "automobile industry." When asked about this on voir dire, Woodside stated her stepson presently worked for an "auction" company that sold cars to "car dealerships." Because these answers "strongly suggest" her stepson was working "in 'auto sales,' as or with a 'dealer,'" Superior concludes NMAC forfeited the misconduct issue because it was "on full notice of [stepson's] involvement with 'auto sales' but asked no questions of Woodside" on voir dire.

This argument glosses over the fact Woodside *never* disclosed her stepson formed and owned a car dealership and currently was working for another car dealer when answering question No. 24 or questions posed to her during voir dire. Superior, however, argues NMAC should have known Woodside's stepson worked at a car

dealership because Vehicle Code section 285 includes an auto auction company in its definition of a "dealer." Superior concludes Woodside's voir dire answers and the Vehicle Code definition of a dealer point only to one conclusion as a matter of law: NMAC knew Woodside's stepson worked at a car dealership. The argument borders on the frivolous.

Superior never explains why NMAC should have known Woodside relied on the Vehicle Code definition of "dealer" when she stated her stepson worked at a car auction company. It is evident the trial court reasonably could conclude Woodside's reference to the car auction company was not a veiled reference to the Vehicle Code's definition of a dealer, but rather based on the common understanding that a car auction is entirely different from a car dealership. Even if Woodside secretly meant to rely on the Vehicle Code definition of dealer, the court could conclude NMAC was unaware of this. Woodside's failure to state directly that her stepson worked at a car dealership, either in her answer to question No. 24 or during voir dire, conveyed to NMAC her stepson had something to do with auto sales but nothing to do with car dealerships. Nothing about Woodside's responses undermines NMAC's "'no knowledge'" declaration.

*Questions Nos. 19, 20, and 43*

Question Nos. 19 and 20 on the juror questionnaire asked whether "you, any members of your family, or close friends" had filed a lawsuit or been sued. Question No. 43 asked if the prospective juror had been "accused of breaching a contract or failing to honor a commitment you made in a business or other deal." Woodside answered "no" to all three of these questions. In its new trial motion, NMAC presented evidence from Woodside's 1998 bankruptcy case showing she had been sued seven times, including three unlawful detainer actions. The same bankruptcy filings revealed Woodside had her car repossessed, which meant she defaulted on her conditional sales contract.

Superior argues this was not newly discovered evidence because during voir dire NMAC's attorneys knew Woodside had filed bankruptcy. NMAC's legal team

23

discovered this when conducting Internet searches of the prospective jurors. But that fact was all they knew. The record shows they were unable to learn anything about her bankruptcy because the federal courts' Web site did not make the underlying records available. NMAC requested the records but did not receive them until after the verdict.

Superior argues NMAC should not have delayed its request for the records and claims the records would have arrived before the jury began its deliberations if NMAC had ordered them promptly. But the fact Woodside filed bankruptcy in 1998 does not suggest she deliberately falsified answers on the juror questionnaire. The trial court could conclude NMAC acted reasonably in viewing her failure to mention her bankruptcy on the questionnaire as an innocent nondisclosure. Nothing here shows the court abused its discretion in concluding NMAC had no basis at this early stage of the trial to claim Woodside harbored a prejudicial bias against NMAC based solely on her 1998 bankruptcy petition.

Relying on *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567 (*Donovan*) and *People v. Green* (1995) 31 Cal.App.4th 1001 (*Green*), Superior argues NMAC forfeited its right to raise Woodside's concealment in a new trial motion because it did not question Woodside during voir dire about her bankruptcy.

Superior's argument rests on the faulty premise NMAC did not ask about these matters in voir dire. But NMAC and Superior prepared a juror questionnaire for voir dire containing 56 questions with several questions asking jurors to describe their background and experience. And contrary to Superior's suggestion, neither *Donovan* nor *Green* declare that a party forfeits its right to raise juror misconduct in a new trial motion because it did not question the prospective juror who failed to disclose material information or gave false and misleading answers during voir dire. (*Donovan, supra*, 167 Cal.App.4th at p. 625 [no forfeiture because juror "did not conceal or provide false or misleading information during voir dire"]; *Green, supra*, 31 Cal.App.4th at pp 1015-1016 [no forfeiture because juror did not deliberately conceal information and parties did not

24

ask about juror's background].)  Here, in contrast, the trial court found Woodside's "patently false" and "misleading" answers misled NMAC, and had she accurately answered certain questions NMAC's counsel likely would have asked probing follow-up questions.  Ultimately, whether NMAC orally questioned Woodside is beside the point.  If NMAC had evidence Woodside committed misconduct it had an obligation to raise the issue immediately, whether or not it questioned Woodside during voir dire.  And if NMAC was unaware of Woodside's false or misleading answers it could not knowingly waive the issue when it relied on her answers to the questionnaire in deciding not to orally question her during voir dire.

Finally, Superior contends NMAC forfeited its argument Woodside based her timing belt question on information obtained outside of court and not part of the evidence presented in trial.  In its new trial motion, NMAC's attorney submitted a declaration describing how he searched Google for the term "'Nissan lawsuit,'" which revealed a recent class action lawsuit over Nissan's allegedly defective "timing chains." Since the evidence at trial did not mention faulty timing belts on Nissan cars, NMAC surmised the "most likely explanation" was that Woodside researched the matter on the Internet.

Superior argues "Nissan plainly knew its own class action litigation" and therefore Woodside's "outside research was known to Nissan from Day 1, and the Court could not reasonably have found otherwise or properly relied on it."  Superior again overstates its case.

Superior offers no evidence NMAC knew about the class action lawsuit over "timing chains," nor does it explain why the trial court could not simply believe NMAC's claim it was unaware of the class action lawsuit against Nissan.  And contrary to Superior's claim, NMAC is not Nissan, but a finance company and a separate corporate entity from Nissan North America, Inc.  The court reasonably could rely on

25

NMAC's claim it had no knowledge Woodside based her question on outside research. We will not second-guess the court's credibility determinations.

In sum, substantial evidence supports the trial court's express and implied factual determinations. It therefore follows the court did not abuse its discretion in rejecting Superior's forfeiture arguments.

*The Trial Court Did Not Abuse Its Discretion in Granting NMAC's New Trial Motion*

Superior challenges the sufficiency of the evidence supporting the trial court's order granting NMAC's new trial motion based on juror misconduct. Fundamental principles of appellate review compel us to reject Superior's arguments.

As noted, we apply the abuse of discretion standard to the trial court's written order granting a new trial for juror misconduct. (*Weathers, supra*, 5 Cal.3d at p. 109; *Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 59 (*Ovando*).) When the exercise of the court's discretion depends on how it resolves questions of fact, we must defer to the court's "'credibility determinations and findings on questions of historical fact if supported by substantial evidence.'" (*People v. Collins* (2010) 49 Cal.4th 175, 242.) Whether those facts constitute misconduct is a legal question we review independently. (*Ibid.*)

Here, the trial court in its written order found Woodside's failure to disclose material information on the juror questionnaire reflected a state of mind that "would prevent [her] from acting impartially." The court also found Woodside's timing belt question, "in hindsight," showed "she had information from some source that was outside the evidence." The court concluded Woodside's "serious" misconduct in a close case was prejudicial to NMAC.

In reaching these conclusions, the trial court found that Woodside concealed her bias with "patently false" or misleading voir dire answers. The court specifically focused on her failure to disclose "she had been personally sued multiple

26

times in civil actions," including several unlawful detainer actions. The court also referred to Woodside's failure to disclose her stepson had owned a wholesale car dealership and he and his wife worked for a car dealership. The court rejected Woodside's explanation she "'forgot'" to mention her lawsuits, misunderstood certain questions, or thought the nondisclosed material was not responsive to the question, finding her explanations "'not credible.'" The court found Woodside based her timing belt question on "some source that was outside the evidence," and noted there had been "no such evidence presented on any timing belt issue."

Superior contends no substantial evidence supports the trial court's conclusions, arguing Woodside's nondisclosures were unintentional because either she "very reasonably forgot" about the requested information or misunderstood "a complex and extensive questionnaire." As to Woodside's timing belt question, Superior argues NMAC presented "absolutely nothing" to show Woodside based her question on outside sources. To support its argument, Superior substantially relies on Woodside's declaration and faults the court for not crediting her explanations because it was uncontradicted. From this perspective, Superior offers a detailed exploration of the evidence showing that Woodside did not commit misconduct.

Adopting Superior's analysis would turn the standard of review on its head. We must not review the evidence to determine whether substantial evidence supports the losing party's version of the evidence. Instead, we must determine if there is any substantial evidence, contradicted or uncontradicted, to support the trial court's findings. (*Campbell v. Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [the appellate court "'looks only at the evidence supporting the successful party, and disregards the contrary showing'" in determining the sufficiency of the evidence (italics omitted]; *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245.) "'[I]t is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we

27

will not disturb [the new trial order] if there is evidence to support it.'" (*Williamson v. Brooks* (2017) 7 Cal.App.5th 1294, 1300.)

*Voir Dire Nondisclosures*

Applying these principles, we conclude substantial evidence supports the trial court's factual findings that Woodside failed to disclose "she had been sued multiple times in civil actions" and she failed to disclose her stepson's and daughter-in-law's connections with car dealers. Substantial evidence also supports the court's finding Woodside's nondisclosures stemmed from "a state of mind that would prevent a person from acting impartially."

Woodside answered "No" to questions on the juror questionnaire asking whether "you, any members of your family, or close friends" had filed a lawsuit or been sued. NMAC, however, presented evidence in its new trial motion that Woodside was a defendant in three unlawful detainer actions, a defendant in two personal injury lawsuits from 1985 and 2000 involving auto accidents, and was an officer, director, and agent for service of process for a corporation sued by the State of Florida for securities violations.

Superior, at the new trial motion and on appeal, relies on Woodside's declaration claiming she did not recall two of the unlawful detainer actions and the other unlawful detainer action named a different person with the same name. Nor did she recall the two personal injury lawsuits or the lawsuit against her corporation, which was controlled by her former husband. Woodside also claimed she did not consider her stepson's involvement to be a car dealership because he acquired and sold rare or "exotic" vehicles to clients. Superior argues the evidence, which includes Woodside's declaration, does not support the trial court's finding Woodside was biased toward NMAC because her nondisclosures were unintentional.

The trial court, viewing the evidence as a whole, rejected Woodside's explanations, specifically finding it "not credible" that she "'forgot' her lengthy litigation history or simply did not consider it worth mentioning or applicable to questions Nos. 19,

28

20, 24, 43 and No. 49." The court found it likely Woodside's nondisclosures were intentional and therefore revealed Woodside had a state of mind that prevented her from acting as an impartial juror. Substantial evidence supports the court's factual findings.

Based on the scope of Woodside's nondisclosures and the implausibility of some of her explanations, the trial court reasonably could infer Woodside's omissions concealed a state of mind that prevented her from being an impartial juror. The court did not believe her explanations and we must defer to the court's credibility findings. Consequently, we may not credit Woodside's explanations, "regardless how 'overwhelming' it is claimed to be." (*Beck Development Co. v. Southern Pacific Transportation Co*. (1996) 44 Cal.App.4th 1160, 1204.) The extent of her nondisclosures also supports the court's finding it was likely her nondisclosures were intentional, which raises a presumption of prejudice. (*In re Manriquez, supra,* 5 Cal.5th at p. 798.) As the court noted, even an unintentional nondisclosure may mask actual bias if it shows a state of mind which prevents a juror from acting with "'entire impartiality.'" (*Id*. at pp. 798-799.)

### *The Timing Belt Question*

After the morning session on the first day of trial, Woodside submitted nine questions, including the following inquiry: "From 2006 to 2008, Nissan withheld faulty timing belts manufactured on six different models. Did they disclose this potential liability that they put Mr. Kahn in?" Because neither party introduced evidence or even suggested that Nissan had a problem with malfunctioning timing belts, the trial court questioned Woodside because it was concerned she based her question on information received outside court. Ultimately, the court accepted Woodside's explanation she obtained this information during family discussions with her father and brothers and did not research the issue.

NMAC's new trial motion presented evidence undermining Woodside's claim she learned about Nissan's problems with timing belts from her family.

29

Specifically, the evidence showed there were no Nissan recalls during the 2006 to 2008 period Woodside referenced in her question. Rather, a Google search for "Nissan lawsuit" around the time of opening statements showed numerous links to Web pages containing articles about several class action lawsuits alleging that "Nissan concealed from its customers defective timing chains on six specific models from approximately 2004 to 2009."

The trial court found that Woodside's timing belt question, "in hindsight," showed she had obtained information "from some source that was outside the evidence." The court also found, based on "the totality of the circumstances," Woodside's question showed a likely bias against NMAC.

Superior contends the trial court based its factual findings on nothing more than speculation. Superior again relies on Woodside's claim she learned about Nissan's timing belt issues from family discussions before reporting for jury service. Superior also emphasizes the Internet articles about class action lawsuits against Nissan over "timing chain" defects did not mention timing belts, the lawsuits predated the trial, and numerous public Web sites spread news of these lawsuits.

We again emphasize we must defer to the trial court's credibility findings. Here, the court reasonably could find Woodside's specific references in her question belied her claim she learned about Nissan's timing belt defects from general conversations about cars at family gatherings. Woodside's timing belt question closely matched available online information describing the nature of the lawsuits against Nissan. Indeed, Woodside's question referenced the precise number of Nissan models identified in various articles. Based on evidence of Woodside's misconduct on voir dire, her lack of credibility, and the specific facts referenced in her question, the court reasonably could infer Woodside had obtained information outside the evidence produced at trial.

30

*Prejudice*

Superior contends the trial court erred in finding Woodside's misconduct reflected a bias toward NMAC that prevented her from acting impartially. Superior relies on its arguments contesting the court's finding of misconduct, arguing any "supposed 'misconduct' in this case is 'trifling' and could not have prevented Nissan from having a fair trial." Superior's arguments fail to persuade us the court abused its discretion in finding Woodside's misconduct was prejudicial.

We must review the record "liberally" to determine whether the trial court abused its discretion in granting a new trial. (*People v. Ault* (2004) 33 Cal.4th 1250, 1255.) We also must extend deference to orders granting new trials because "'[t]he trial judge is familiar with the evidence, witnesses and proceedings, and is therefore in the best position to determine whether, in view of all the circumstances, justice demands a retrial.'" (*Id.* at p. 1261.) As one court observed, an appellant seeking to overturn a trial court's discretionary ruling faces "more than a daunting task [and] an uphill battle" in demonstrating the court exercised its discretion arbitrarily and unreasonably. (*Estate of Gilkison* (1988) 65 Cal.App.4th 1443, 1448.)

Civil litigants are constitutionally entitled to a fair trial before an unbiased jury. (*McDonald v. Southern Pacific Transportation Co.* (1999) 71 Cal.App.4th 256, 266; see *People v. Holloway* (1990) 50 Cal.3d 1098, 1112 [defendant "entitled to be tried by 12, not 11, impartial and unprejudiced jurors"].) Juror misconduct violating the right to an impartial jury raises a rebuttable presumption of prejudice. (*Ovando, supra*, 159 Cal.App.4th at p. 58.) "Misconduct was prejudicial if there is a substantial likelihood that the juror was biased and that the misconduct affected the verdict." (*Ibid.*)

Here, the trial court expressly found Woodside's "answers during voir dire, some of which were patently false, and others misleading, concealed her bias," which deprived Nissan of its right to an impartial jury. The court also found Woodside obtained information outside the evidence presented at trial in posing her timing belt question,

31

which in turn revealed a substantial likelihood she was biased against NMAC. Finally, the court concluded Woodside's bias prejudiced NMAC because it may have obtained a more favorable verdict "without the misconduct."

The trial court found Woodside's voir dire nondisclosures prejudiced NMAC, explaining that if Woodside had provided accurate responses she "could have been challenged for cause and nearly certainly challenged peremptorily by [NMAC]." We see no basis to fault this conclusion. Even assuming an unsuccessful challenge for cause, it is difficult to see why NMAC's trial counsel would have wanted Woodside on the jury given her litigation history as a defendant and her likely empathy for Superior since her stepson once owned a car dealership. But NMAC lost the opportunity to remove Woodside because her inaccurate and incomplete answers concealed her bias. (See *Ovando, supra*, 159 Cal.App.4th at p. 58 ["[o]ne of the purposes of voir dire is to expose the possible biases of potential jurors," but voir dire "'cannot serve this purpose if prospective jurors do not answer questions truthfully'"].) Nondisclosures during voir dire "eviscerate a party's statutory right to exercise a peremptory challenge and remove a prospective juror the party believes cannot be fair and impartial." (*In re Hitchings* (1993) 6 Cal.4th 97, 111.)

The trial court also expressly found Woodside's timing belt question showed a substantial likelihood she was biased against NMAC. The court found Woodside based her timing belt question on "information from some source that was outside the evidence." Three jurors declared Woodside raised the topic of Nissan recalls during deliberations on the amount of damages. (*People v. San Nicolas* (2004) 35 Cal.4th 614, 649 [juror commits misconduct when expressing opinion based on specialized knowledge obtained from outside source].) Even if the other jurors did not rely on Woodside's information about Nissan recalls, the fact remains she voted with the majority in finding NMAC liable by a nine to three vote. As the Supreme Court observed in *Weathers*, a litigant who lost by a nine to three vote was entitled to a new trial because

32

"the disqualification for bias of any one of the majority jurors could have resulted in a different verdict." (*Weathers, supra*, 5 Cal.3d at p. 110.)

In sum, Superior has not rebutted the presumption of prejudice or shown the trial court acted arbitrarily or capriciously in finding Woodside committed prejudicial misconduct and awarding NMAC a new trial. We therefore affirm the new trial order.[10]

## NMAC'S CROSS-APPEAL FROM THE JNOV ORDER

NMAC contends the trial court erred when it denied NMAC's motion of JNOV on the negligent misrepresentation and fraudulent concealment claims. We conclude substantial evidence supports the court's decision to reject NMAC's JNOV motion.

We review whether substantial evidence supports the verdict, viewing the evidence in the light most favorable to the party obtaining the verdict. We must accept as true the evidence supporting the verdict, disregard conflicting evidence, and draw every legitimate inference in favor of the verdict. We do not weigh the evidence or judge the credibility of the witnesses. We uphold the trial court's denial of JNOV only if sufficient evidence supports the verdict. (*Colaco v. Cavotec SA* (2018) 25 Cal.App.5th 1172, 1182.)

---

[10] Superior complains NMAC engaged in what it calls "post-verdict juror character assassination" of Woodside when it researched social media, court records, and other sources of information concerning Woodside and her family. NMAC supported its new trial motion with evidence it obtained in its postverdict investigation, and Superior does not contend the nature of NMAC's investigation precludes us from reviewing that evidence on appeal. We note in passing the American Bar Association has concluded lawyers violate no ethical standards in reviewing what jurors publicly post in social media. (See ABA Approves Researching Jurors' Public Presence on Internet, Criminal Justice, Vol. 29, No. 3 (2014) "In Formal Opinion 466 (Apr. 24, 2014) . . . the standing committee explains that Model Rule 3.5(b) prohibits a lawyer from communicating ex parte with a juror or prospective juror, but a lawyer may review a juror's public presence on the Internet"].) Of course, postverdict investigations must not harass or violate the privacy rights of former jurors.

33

*Negligent Misrepresentation*

"The elements of a negligent misrepresentation are '(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage.'" (*Tindell v. Murphy* (2018) 22 Cal.App.5th 1239, 1252.)

A negligent misrepresentation is "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." (Civ. Code, § 1710, subd. (2).) The misrepresentation applies only to past or existing material facts. "'[P]redictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud.'" (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 158.) "Although a false promise to perform in the future can support an *intentional* misrepresentation claim, it does not support a claim for *negligent* misrepresentation." (*Stockton Mortgage, Inc. v. Tope* (2014) 233 Cal.App.4th 437, 458 (*Stockton*).)

NMAC contends Superior's negligent misrepresentation claim fails as a matter of law because no evidence showed Lambert misrepresented a past or existing fact. Relying on *Stockton*, NMAC argues Lambert's statements were promises of future performance, which "cannot be the basis for a negligent misrepresentation cause of action." (*Stockton, supra*, 233 Cal.App.4th at p. 458.) NMAC also contends no evidence showed Superior justifiably relied on Lambert's promises when "it repeatedly negotiated and executed contrary written agreements."

Superior contends the doctrine of law of the case applies to bar NMAC's challenge to the sufficiency of the evidence raised in its JNOV motion. Although Superior reads our decision in NMAC I to "implicitly" hold that sufficient evidence supported every element of the negligent misrepresentation claim, our opinion in NMAC

34

I did not decide whether there was sufficient evidence Lambert's statements constituted a past or existing material fact.

"""""The doctrine of 'law of the case' deals with the effect of the *first appellate decision* on the subsequent *retrial or appeal*:  The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case."""" (*Leider v. Lewis* (2017) 2 Cal.5th 1121, 1127.)  The doctrine does not apply to legal issues that might have been but were not decided in the earlier appeal, but it applies "'to questions not expressly decided but implicitly decided because they were essential to the decision on the prior appeal.'" (*Ibid*.)  Law of the case doctrine applies to a subsequent appeal even if the court that issued the opinion becomes convinced its earlier opinion was wrong.  (*Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2007) 157 Cal.App.4th 149, 156.)

In addition to addressing the retroactivity of *Riverisland*, our opinion in NMAC I also resolved NMAC's claim any error was harmless because "no reasonable juror could conclude [Superior] justifiably relied on [Lambert's] supposed oral promise." NMAC based its harmless error claim on the evidence Superior offered at the trial court's pretrial hearing.  (*NMAC I, supra*, at p. 17)  We rejected NMAC's argument and concluded Superior "did manage to present substantial evidence that Kahn reasonably relied on Lambert's oral promises of continued funding regardless of SOT's.  That evidence consisted of NMAC's course of conduct in tolerating SOT's even after the November [forbearance agreement], as well as the personal trust Kahn placed in Lambert as a result of their longstanding working relationship, 'CEO to CEO.'" (*Id.* at pp. 18-19.)  Because Superior presented this evidence again at the trial we are reviewing, our decision in NMAC I established that substantial evidence showed Superior justifiably relied on NMAC's representations.  Consequently, under the law of the case doctrine, NMAC may not challenge the sufficiency of the evidence on the element of justifiable reliance.

NMAC, however, did not argue in NMAC I the negligent misrepresentation claim failed as a matter of law because the evidence showed Lambert's statements were promises of future performance and not statements of existing or past facts. We therefore did not expressly or implicitly decide whether Lambert's statements constituted substantial evidence of negligent representation or whether they involved past or existing material facts. Consequently, we now must decide whether Superior presented at trial sufficient evidence to support these elements.

Superior based its negligent misrepresentation claim on several of Lambert's assurances during the latter part of 2008 and early 2009, including a November 3, 2008 call concerning Superior's sales out of trust. According to Kahn, Lambert told him not to worry about the out of trust sales, explaining, "Just do the best you can. Everything is going to be fine." Lambert also stated, "Mike, nobody is shutting you down." But just two weeks earlier on October 14, Kevin Cullum, the Director of Commercial Credit, sent an e-mail to Lambert recommending a "complete separation" from Superior, explaining, "I simply do not trust [Kahn's] plan or his ability long-term to manage profitable dealerships and to pay us as agreed."

On October 28, 2009, an internal e-mail from Cullum noted Lambert had asked him about various "scenarios," including the cost of shutting Superior down. The e-mail also identified the option to continue NMAC's relationship with Superior, even if that meant more sales out of trust. To answer Lambert's questions, Cullum directed the preparation of a spreadsheet evaluating whether Kahn could meet his obligations to NMAC.

Based on this evidence, the jury reasonably could conclude NMAC was actively investigating whether to shut Superior down when Lambert assured Kahn "nobody is shutting you down." Because Lambert had not yet determined whether NMAC would continue to support Superior, the jury could view the evidence of Lambert's assurance as an honest assertion of fact without a reasonable basis for

36

believing it to be true since he and his advisers were contemplating the path he assured Kahn NMAC would not take: shutting Superior down.

The special verdict form asked the jury to determine whether NMAC was liable for a negligent misrepresentation. The evidence of Lambert's November 3 assurance he would not shut Superior down constitutes substantial evidence of a negligent misrepresentation. Accordingly, we need not discuss whether substantial evidence supports the other statements Superior claims were negligent misrepresentations. Based on the evidence of Lambert's November 3 statement to Kahn, the trial court properly denied NMAC's JNOV on the negligent misrepresentation claim.

*Fraudulent Concealment*

NMAC contends the trial court should have granted JNOV on the fraudulent concealment claim because there "is no duty to disclose in advance either the intention not to perform a good-faith promise or the intention to enforce a contract." Alternatively, NMAC argues that even if it had a duty to disclose, it did so when it "repeatedly disclosed in writing that it had the right to discontinue lending if Superior breached its obligations under the loan agreements." Finally, NMAC argues Superior failed to prove detrimental reliance. We are not persuaded by any of these contentions.

The elements for a fraudulent concealment claim are: "'"" (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage."'"" (*Boschma v. Home Loan Center, Inc*. (2011) 198 Cal.App.4th 230, 248.)

No liability for concealment exists unless there is a duty to disclose. "'[W]here material facts are known to one party and not to the other, failure to disclose

37

them is not actionable fraud unless there is *some relationship* between the parties which gives rise to a duty to disclose such known facts.'" (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336-337 (*LiMandri*).) A fiduciary or confidential relationship creates a duty to disclose, but other relationships also support imposing disclosure duties. These other relationships can only arise "as a result of some sort of *transaction* between the parties." (*Id*. at p. 337.) Examples include "the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement." (*Ibid*.)

Relevant to the element of duty for fraud and deceit claims, "[i]n transactions which do not involve fiduciary or confidential relations, a cause of action for nondisclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from the plaintiff." (*Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 294, fns. omitted.)

The jury specifically found the relationship between NMAC and Superior created a duty to disclose. When asked on the special verdict form, "Did NMAC and Superior have a relationship based on their transactions which give rise to a duty to disclose," the jury answered "yes." The jury also found NMAC did one or more of the following: "(a) disclose some facts to Superior but intentionally fail[ed] to disclose other facts, making the disclosure deceptive; [] (b) intentionally fail[ed] to disclose facts that were known only to it and that Superior did not know and could not reasonably have discovered; [] (c) prevent[ed] Superior from discovering certain facts." The jury also found NMAC intended to deceive Superior by its concealment. Ample evidence supports these findings.

NMAC and Superior had an ongoing transactional relationship since 2001. During late 2008 and the beginning of 2009, the parties entered into several forbearance agreements. Based on Kahn's testimony, there was evidence NMAC and Superior had several oral agreements concerning how to get through the ongoing financial crisis. As *LiMandri* explains, a duty to disclose may arise when parties enter into "any kind of contractual agreement." (*LiMandri, supra*, 52 Cal.App.4th at p. 337.)

Substantial evidence also supports the jury's conclusion NMAC intentionally failed to disclose material facts it had a duty to disclose. For example, according to Kahn, Lambert represented NMAC would finance Superior through 2009 and assured Kahn NMAC would continue working with Superior even if Superior's payments missed the 2 day/10 day deadline. On November 3, 2008, Lambert told Kahn NMAC would not shut Superior down while at the same time he and his staff were contemplating that option. On January 5, 2009, Lambert represented that once Superior provided financial projections for 2009 "we'll get you the money and we'll be in good shape." Three days later Lambert decided to "pull the plug" on Superior, but did not inform Superior. Instead, Cullum made plans to foreclose on Kahn's real estate assets, including his home. None of this was disclosed. After Kahn on February 9 signed a deed of trust on his home, NMAC terminated its lending to Superior two days later on February 11. Despite several representations NMAC would continue to finance Superior and continue to move forward on the same terms as it had in the past, NMAC failed to disclose its January 8 decision to "pull the plug." These nondisclosures occurred even though NMAC normally would inform a dealership of its decision to stop financing the dealership, according to Mike McConnell, NMAC's Vice-President of Operations and Commercial Lending.

NMAC argues it had no duty to disclose its intention not to perform its oral promises because the jury found "*all* of NMAC's promises were made in good faith." The jury, however, found NMAC made "*a* promise to Superior" and intended to perform

39

"*this* promise."  The jury's finding NMAC's good faith intent to perform a promise did not prevent the jury from considering whether NMAC breached its duty to disclose material information that was at odds with its earlier oral promises.

*Marketing West, Inc. v. Sanyo Fisher (USA) Corp*. (1992) 6 Cal.App.4th 603 (*Marketing West*) is instructive.  There, several sales representatives worked for the defendant under an oral agreement that provided they could be terminated only for good cause.  After a corporate merger, the defendant's Senior Vice-President presented the sales representatives with written employment agreements that permitted terminating employment without cause, superseding the oral agreement.  The vice-president, however, told the employees the written agreements """"did not mean anything"""" and did not change the terms of their employment relationships, but were merely a """"formality"""" for reorganizing the business.  (*Id*. at p. 609.)  The appellate court held these facts presented a triable issue of material fact for a fraudulent concealment claim because the employer concealed its decision to terminate the representatives' employment.  (*Id*. at p. 613 [applying *Warner Constr. Corp., supra*, 2 Cal.3d at p. 294].)

Thus, the employer in *Marketing West* concealed its decision to fire its sales representatives while simultaneously assuring them their existing employment relationship would continue as before if they signed a new contract.  Similarly, NMAC concealed its decision to shut down Superior while simultaneously assuring Kahn its relationship with Superior would continue as before through 2009.  NMAC's concealment furthered its goal of securing more collateral from Kahn, including his home.

NMAC asserts there is no duty to disclose deliberations about whether to enforce a binding contract or breach a good-faith promise since the law does not require a party to warn the other party to a contract of its intention to breach, even if those deliberations are with the exclusive knowledge of the breaching party.  Superior, however, based its fraudulent concealment claim on more than NMAC's decision to

40

breach a promise. Superior based its claim on NMAC's failure to disclose material information that would have shown NMAC's disclosed representations were false or misleading. As *Marketing West* observes, "'[t]he rule has long been settled in this state that although one may be under no duty to speak as to a matter, "if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to the state truly what he tells but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all he must make a full and fair disclosure." (*Marketing West, supra*, 6 Cal.App.4th at p. 613.)

NMAC also contends Superior's fraudulent concealment claim fails as a matter of law because NMAC did not present any evidence of detrimental reliance "in the brief period in January 2009 between NMAC's decision not to extend additional loans to Superior and its disclosure of that decision to Superior." NMAC raised the same claim in our earlier opinion. We noted Superior presented evidence that Lambert's promise to continue funding Superior induced Kahn to provide substantial additional collateral, personal guaranties, money, and incur more debt to complete the Oakland Toyota store. We concluded "[t]his evidence easily established the element of detrimental reliance." (*NMAC I*, at p. 21.) Superior presented the same evidence in the retrial. Consequently, we need not revisit the issue under the law of the case doctrine. Even if the doctrine did not apply, ample evidence supports the jury's finding Superior would have acted differently if NMAC had met its disclosure obligations.

41

*Punitive Damages*

NMAC contends punitive damages on the fraudulent concealment claim violates due process because NMAC did not receive fair notice its conduct could subject it to punishment "based on Superior's brand new, vastly expanded version of concealment." Of course, fraudulent concealment is an intentional tort that may support a punitive damage award. (See *Roddenberry v. Roddenberry, supra* 44 Cal.App.4th at pp. 665-667.) In any event, any issues concerning punitive damages should be addressed to the trial court on remand.

## DISPOSITION

The new trial order and the JNOV orders are affirmed. Each party to bear its own costs on appeal.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


THOMPSON, J.